## John Shultz v. The State.

The provision of the Constitution, which requires all prosecutions for offences to be conducted in the name of the State of Texas, has no reference to the style of entitling the case on the docket or papers filed.

See this case for circumstances under which it was held that a prosecution which was commenced under the Republic of Texas, was prosecuted to judgment, after annexation, in the name of the State of Texas, conformably to the second Section of the thirteenth Article of the Constitution.

Where the Judge has given the law properly in charge upon a point, it is not error that the Judge refused to give it in the phraseology in which it was asked by counsel.

Where the Court instructed the jury that if they entertained " a reasonable doubt of the guilt of the prisoner, they will give him the benefit of that doubt," and that it was " essential that the circumstances proved should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, known or unknown," it was held not erroneous that the Court refused to give the following instruction : " If, confining yourselves to the " evidence which has been introduced, and basing your reflections on that evi- " dence alone, a reasonable doubt should remain upon your minds as to the " guilt or innocence of the prisoner, it is your duty to acquit him."

In order to convict on circumstantial evidence, it is not essential that the circumstances proved, should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, known or unknown ; but this rule, which is the one laid down by Starkie, should be qualified by adding, any reasonable hypothesis, consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person, must harmonize with the evidence.

Where there is a question as to the sanity of a prisoner at the time of the trial, and the question is submitted to a jury and the prisoner found to be sane, all evidence of the present insanity of the prisoner, not intended to prove insanity at the time of the commission of the offence, should be excluded on the trial of the issue of guilty *vel non.*

See this case for circumstances of circumstantial evidence under which it was held that the defendant was properly convicted of murder in the first degree.

It seems that on a trial for murder, where the evidence for the prosecution is wholly circumstantial, it is necessary for the defendant to make it appear, on appeal on the ground that the verdict is not sustained by the evidence, that there is some reasonable hypothesis, consistent with the facts proven, from which it can be inferred that the murder was committed by some other person, known or unknown.

Appeal from Galveston. The appellant was indicted on the 1st of May, 1845, for the murder of Matthew Jett. At the

Spring Term, 1854, he was tried and convicted of murder in the first degree, and prosecuted this appeal.

The transcript, on appeal, commenced in the usual form reciting "the following cause came on for trial, viz: The Republic of Texas v. John Shultz." Then followed the indictment; *capias* without any return; entry of continuances, without repetition of the style of the case, until the Spring Term, 1854. At this term the District Attorney filed a motion as follows:

The Republic of Texas, }  No. 1.
      v.     } In the District Court of Galveston
John Sultz.     } County, Spring Term, 1854.

And now comes the District Attorney who prosecutes for the State of Texas in this behalf, and says that the defendant, John Shultz, stands indicted for the killing and murder of Matthew Jett, a capital offence, whereupon the Court is moved to order that a copy of the indictment be delivered to the said defendant, John Shultz, and that a *venire facias* be ordered in this behalf, returnable forthwith, by virtue of which the Sheriff of said county shall summon thirty-six persons to serve as jurors, and that a list of the persons thus summoned as jurors, be served upon said defendant.

J. C. McGONIGAL,

District Attorney.

Then followed the corresponding order, and an order for the appointment of counsel to defend, without further style of the case, or statement of the name in which the proceedings were had.

Then followed the special *venire facias*, with the style required by the Constitution of the State, viz: "The State of Texas, to the Sheriff, &c., greeting." It may suffice here to state, that the style of the case remained the same throughout all the proceedings. There was a preliminary trial of the present sanity of the prisoner, which was found against the prisoner. No question was reserved upon it. The entry of the trial, after stating the style of the case, proceeded, "This day came the State, by the District Attorney, the prisoner was

brought to the bar, and the indictment was then and there read to the prisoner, and the said John Shultz being forthwith demanded," &c.; after stating the defendant's plea of not guilty, and the impanneling of the jury, "who were duly elected, tried and sworn, well and truly to try and true delive-rance make between the State and the prisoner at the bar;" verdict of guilty of murder in the first degree; motion for new trial overruled.

The entry of judgment commenced as follows:

The Republic of Texas
v.                            Indictment for the murder of
John Shultz.                   Matthew Jett.

The prisoner being convicted of murder in the first degree on a previous day of the Term, was this day brought into Court in charge of the Sheriff, &c., &c. Whereupon, it is considered by the Court that the verdict of the jury be approv-ed; that the prisoner be condemned to be hanged by the neck until he is dead, and that he pay the costs of this prosecution. But, inasmuch as the prisoner has entered an appeal to the Supreme Court of the State, the sentence of execution is de-layed until after the determination of the case in said Court. And it is ordered that the prisoner be remanded to jail, and be there safely kept until the further order of the Court."* The name of the prisoner did not occur in this entry, except in the style of the case.

There was a statement of facts as follows:

J. L. Briggs sworn. Was on a jury of inquest in 1845, foreman, on the bodies of two men, who had evidently been murdered the night before; the one who was called Mr. Jett lay with his head in the saddle, his right arm partially extend-ed, with a lariat around it. I would not be positive whether around the arm or leg; we found a ball hole right above the eye, that had evidently been put there by a gun or pistol,

---

* This judgment is given in full, as the form of such a judgment as our statute seems to contemplate, in cases of appeal, instead of a sentence, with a day fixed for execution.

which extended to the back of the head and caused death ; also skull broken ; and his throat cut from ear to ear ; a pistol, one barrelled, lay there broken ; it was some time before we could find the fragments ; we did not find them all.  We also found a razor.  It was the physician's opinion that the pistol ball killed him.  It was about three-fourths of a mile from Virginia Point in the direction of Henry's, on the road.  Two horses were in sight from Virginia Point ; one of which, as I said, was fast to the man who was called Jett.  Upon reflection, what I have called horses were mules ; I call them all horses.  I cannot say the pistol shown was the one.  It was broken similarly.  Jett was shot by a very large ball.  The pistol appeared to have been broken from the blow on the head.  The skull showed signs of a heavy blow.  The appear-ance was that he had been dead but a short time.  He was a man about as tall as I am ; thicker set ; darker complexion. His muscles were well developed, and he appeared to have been a very strong man.  The manner in which the body lay, it was evidently done when he was asleep.  I do not recollect whether any saddle-bags ; or how his clothes were found ; no money on the bodies ; we examined them to see.  I think it was in fore part of January, 1845 ; started from here about 11 o'clock, and got back same day after night.

John Iams swoon.  I was at Virginia Point when the cir-cumstance occurred.  All the way we knew who they were, they had papers in their pockets, that had their names on ; the names of Matthew Jett and Bateman.  They were about a mile from Virginia Point where we were.  The first we knew of them, we saw the mules, and did not know how they came to be there.  The next we knew was Dr. Martin's com-ing down from the Brazos, along the road, and told us he saw two men, one of whom appeared to be partly alive, and the other did not move ; saw blood ; said they appeared to have been in a fight or something ; did not get down to examine them, because his horse was shy.  It was about sun down when he came to us.  A servant went out immediately, and

returned and reported that one of the men was dead, and the other was alive yet. We immediately got a little buggy wagon and went out, several of us. We took Mr. Bateman up and brought him to the house in a buggy; he is the one that was still alive; brought in their saddle-bags; found no money; don't recollect what the paper was, except a small memorandum book in Jett's pocket, with his name in it. It appeared that their pockets and saddle-bags had been previously overhauled; the papers lay scattered about. It appeared from the pallet as if three men had lain down. There were two mules fast to Jett's arm. Jett's head lay in the saddle on the ground. It appeared as if Bateman had run around after he was shot, followed by another person. It appeared to have been done while the dew was on, from the muddy marks of their feet on the grass. Jett appeared to have been struck in the head with a pistol. (Breech of pistol shown.) Looks like the one; it is something of the size. It was in the winter of 1845. I was there that morning, at Virginia Point; heard a man enquire in a strange voice, about daylight, whether the New York was in town and was to leave that day; saw him when I got up; he was holding a mule which he appeared to have been riding. The prisoner is the man; somewhat changed, but the same man. Saw the New York getting up steam. This man was very anxious to get over, for fear the steamer would leave him. Tom Wright, the son of the Captain of the steamer New York, was there at the house, and told Shultz that the steamer would not leave Galveston until he, Tom Wright, got over there, and that Shultz could go over when he did. Walked all morning in front of the house; refused to come in when invited; the morning was cool; Mr. Peasley, the proprietor of the place, asked him if he would not have breakfast; said he did not want any; would not take any coffee; cold enough to be a slight frost; remained there until 9 or 10 o'clock, when they got the ferry-boat off, and he went over in it. I have not seen him since until to-day. He gave his mule in charge of Mr. Peasley, to take care of until

he should return from New Orleans. Saw mules at a distance in the morning. Spoke of going to them, but when discovered that they were mules, with a glass, gave it out. Jett appeared to have been killed about two hours before day; could see from the mud on the grass where Bateman had been followed, that the dew had been on the grass when it was done. Found two silver watches in a buckskin bag; don't know whether in pocket or in saddle-bags. Did not appear to be in running order. Jett looked like a very stout muscular man, dark complexion. This occurred in Galveston county. I was frequently in the house and frequently out while Shultz was there; always when we noticed him he kept looking back towards where we afterwards found the men murdered, and seemed very much excited. Bateman never recovered so as he could speak. Bateman died 1 or 2 o'clock that night we found him; was a stout man, light complexion, some slight gray whiskers, rather a stout short man; apparently 55 or 60 years of age, gray. I suppose Jett was between 25 and 30; dark colored clothes; two blanket coats where they laid; saw no other persons pass in that neighborhood that day, except Dr. Martin. The evening before the prisoner came to the Point, or just at night, a gentleman riding a gray horse crossed at the ferry and passed up that road where we afterwards found the murdered men. Did not know who he was; have not seen him since to know him. My recollection is that he went over from this side. It was pretty late in the evening. It was near night; had time to go out some 7 or 8 miles.

Charles Power sworn. I rode that day from Brazoria; overtook three men on mule-back. The elder man came to me and asked me the road to Virginia Point. I told them the way; that I was riding to Virginia Point myself. Rode fast; got to Virginia Point about sundown, and came over to Galveston that night. I was riding a gray horse. I could not say how far from Virginia Point I overtook them; it was beyond Henry's; think it was between Mustang Slough and Hall's Bayou. I will not be positive on this point, but some-

where between the Brazos timber and Henry's; must have been 20 miles from Virginia Point; could not say what time of day. So far as my recollection serves me, must have been about 12 o'clock. I could not say exactly the time of day. Mr. Bateman was a short, stout man, florid complexion, whiskers white, light blue eye, blue blanket coat. The other man was a large man; can't describe him particularly. I recognize the prisoner as one of the three men. Saw these men at that time, which was about the 1st of January, 1845; heard of the murder a short time after.

J. L. Sherwood sworn. Some time in January, 1845, I was called on to go to Virginia Point on an inquest; went over; got Mr. A. Farmer, Magistrate, to act as coroner; went about a mile from Virginia Point and there found the two bodies; we found one there, the other had been brought to the house; recognized Mr. Jett, that is, Mr. Dunbar, one of the jury, did; had served in the army with him. Same as Mr. Briggs as to circumstances. Think the pistol shown was the same pistol; am satisfied it is the same one we found there; cannot swear as to other pistol. Mr. Jett would weigh 160 or 175 lbs; large frame, not much surplus flesh, muscular. Saw some papers; don't recollect given name of either. I did not examine the papers particularly. Bateman had one shot side of the eye and nose; several in the back, like small pistol balls. Dr. Watson took out the balls. I saw them; ball in the face not so large as ball that shot Jett, and larger than those in the back; three sized balls; must have been three balls in the back; think all of the same size. We came to the conclusion shot with a revolver while running; saw no effects of powder-burn. Jett was badly bruised and beaten, his skull; saw where the old man run, a circle; saw but tracks of two men; run twice length of this room, (room ninety feet long.) Mr. Dunbar is in California.

J. L. Briggs recalled. Asked whether there is any man in the room who bears a resemblance to Mr. Bateman? Points out a man who was introduced to him as Mr. Bateman, and

whose features bear a strong resemblance to those of the murdered man ; understand him to be his son.

A. Jones sworn. I recognize the prisoner. I saw him in latter part of 1844. About January, 1845, he left Gonzales with Bateman and Jett, for New Orleans, by way of Galveston ; latter part of 1844 or first part of 1845. Shultz was going with Bateman. Best of my recollection, were mounted on mules ; had been living with Mr. Bateman. Mr. B. in very good circumstances ; plenty of means, I suppose, from manner of living ; had worked some ten or twelve hands from 1837, until that time. The general understanding was that Bateman had sold a tract of land to Shultz, and was going on to get the pay for it. I conjectured from Mr. Shultz offering to sell me a nag very low, telling me he had no money, that his circumstances were limited. This was about three weeks before they left. He had been living with Mr. Bateman, assisting in cropping ; do not know what he got. (Here description of Bateman and Jett, which agreed with that given by Briggs, Sherwood and Power.) Do not know whether Jett had any money with him when he left. Bateman and Jett have never been heard from since, except that shortly after we heard that they were killed near Virginia Point. Jett's name was Matthew Jett. Had been in the army of Texas. Bateman's name was Simeon Bateman. Prisoner will be found to have a scar on his neck. (Examines and finds it so.) I do not know anything about the weapons shown ; resided in Gonzales in 1844, and continued to do so. Shultz had not been heard from since he left Gonzales with Bateman and Jett, until he was arrested and brought back to Texas last winter.

T. S. Netherley sworn. Recognizes prisoner—saw him last in Gonzales, in 1845, as well as memory serves me ; knew Bateman and Jett. Jett left Hays' command to go to Tennessee. I swapped Shultz a mule for a poney just before they started. Shultz, Bateman and Jett started from Gonzales together in company, all mounted on mules. I bid good day

as they were starting from Gonzales; said they were coming to Galveston by land, to take water. Never saw Bateman or Jett since. Heard soon afterwards that Bateman and Jett were killed at Virginia Point, and that was the last we ever heard of them. Bateman resided in Gonzales county; had plantation, and negroes on it. Jett had been a soldier in Jack Hays' company; had not slept in a house probably for three years; recognizes one of the pistols as belonging to Jett; have shot at a mark with Jett with it, probably a hundred times. A few days before starting Shultz came to me and wanted to sell me a horse. I did not buy, and he pawned the horse to me, for thirty dollars, which he said was all the money he had; but don't know whether it was so or not. The horse was worth one hundred dollars. Could have bought him for fifty dollars from Shultz. Shultz never called for the horse afterwards, and never returned or was heard of there, until he was reported last winter to have been arrested in South Carolina. I resided in Gonzales county in 1845, and still reside there.

P. R. Edwards, sworn. Was at Virginia Point the morning after the supposed murder. After I got up, Mr. Shultz was seen at the place; don't recollect whether mule was hitched to fence or tree; manifested great uneasiness to cross, and called on the proprietor to cross him forthwith. Shultz refused to take breakfast, or a cup of coffee. Finally it was concluded to come across in a sail boat. Mr. Wright and Shultz and one or two others came off in the boat. Made an engagement with Peasley to take care of his mule, that he would be back soon. Seemed to be very much in a hurry to cross. Shultz never returned for the mule.

Charles Rosignol, sworn. I saw prisoner on board steamer New York first week in January, 1845. He went on board to New Orleans. I went to New Orleans at the same time.

Mr. Netherley, recalled. Jett drew about $600 from Government, sometime before he started. Shultz did not know Jett until a few days before they started; drew our pay in

1844, towards the last of the season, about the last of December; in San Antonio; drew it in silver, saw the money paid over to Jett; we all drew our money together; most of it five francs or hammered dollars; were not Mexican dollars; don't remember what sort; some of the six hundred dollars was received from the Government directly, and the balance in payment of loans previously made to comrades; do not recollect how much from each source, separately.

Here the prosecution closed.

The defendant called Gilbert Winnie, sworn. I have resided here since 1843; am acquainted with road from Virginia Point to the Brazos; passed over it once. Until three or four years ago it was very obscure. Great complaints were then made, and steps were taken to have the road marked out. There were many trails and paths crossing and running out in all directions, so that strangers were liable to loose the road. The road was but very little traveled.

*The testimony respecting the present sanity of the prisoner is omitted, not being material to a proper report of the case.*

Dr. Holland, the jail physician, a witness for the State, testified: He is a man of unusual nerve; he is eccentric. I could mention several instances of eccentricities; as an instance, his repugnance to liquor, so much so that he refused it in his medicine. He is quite an eccentric man. His general mode of conduct is eccentric. Perfectly calm, quiet, correct in deportment.

The prisoner's counsel asked the Court to instruct the jury as follows:

1st. The testimony in this case is all circumstantial, so far as it concerns the question whether the killing was committed by the prisoner or by some other person. There is no positive evidence to the fact.

2nd. In order to find the defendant guilty on circumstantial evidence, "it is essential that the circumstances proved" should be of a conclusive nature and tendency. (1 Stark. Ev. p. 572 top p.)

3rd. In order to find the defendant guilty, on circumstantial evidence, "it is essential that the circumstances" proved " should to a moral certainty, actually exclude every hypothe- " sis, or every supposition that the act may have been com- " mitted by another person known or unknown." (Id. p. 574.)

4th. Circumstantial evidence is not sufficient to warrant a conviction, unless it be as satisfactory as the testimony of a single witness swearing positively to the fact of the act being committed by the defendant. (Id. p. 577.)

5th. If you find the defendant guilty of murder, you will find by your verdict, whether it is of the first or second degree. The punishment of murder in the first degree is death; the punishment of murder in the second degree is confinement to hard labor in the Penitentiary, for not less than three years nor more than fifteen years. If you find the prisoner guilty of murder in the second degree, you will assess the punishment accordingly.

6th. If, confining yourselves to the evidence which has been introduced, and basing your reflections on that evidence alone, a reasonable doubt should remain upon your minds as to the guilt or innocence of the prisoner, it is your duty to acquit him.

Whereupon the Court gave the same, except as qualified in the following language, and with the additions hereinafter ap-pearing:

If the jury find the prisoner guilty of murder, they will find by their verdict, whether it is of the first or second degree. The punishment of murder in the first degree is death; the punishment of murder in the second degree is confinement to hard labor in the Penitentiary for not less than three years nor more than fifteen years. If the jury find the prisoner guilty of murder in the first degree, they will simply return their verdict to that effect. If the jury find the prisoner guilty of mur-der in the second degree, they will assess the punishment.

By the law in force at the time of the offence, the crime of murder was punished with death. By the law now in force,

"all murder committed by poison, starving, torture, or other "premeditated or deliberate killing, or committed in the per- "petration or in the attempt at the perpetration of arson, rape, "robbery or burglary, is murder in the first degree, and all "murder not of the first degree is of the second degree." The prisoner, if guilty, must be punished by the law now in force.

The testimony in this case is all circumstantial, so far as it concerns the question whether the killing was committed by the prisoner or by some other person. There is no positive evidence to the fact.

In order to find the prisoner guilty on circumstantial evidence, it is essential that the circumstances proved should be of a conclusive nature and tendency. It is essential that the circumstances proved should to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person known or unknown. What circumstances will amount to proof can never be matter of general definition; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury. The circumstantial proof ought to be as satisfactory as the testimony of a single witness to the fact of the commission of the offence.

If the jury entertain a reasonable doubt of the guilt of the prisoner, they will give him the benefit of that doubt.

The jury will disregard the evidence of insanity, unless they believe, from the testimony, that the prisoner was insane at the time of the commission of the offence.

*O. C. Hartley*, for appellant. I. The proceedings subsequent to the indictment, having all been prosecuted in the name of the Republic of Texas, are null and void. The language of the Constitution of the State is, that "all crim- "inal prosecutions or penal actions, which shall have arisen "prior to the organization of the State Government under "this. Constitution, in any of the Courts of the Republic "of Texas, shall be prosecuted to judgment and execution in "the name of said State." (Art. 13, Sec. 2.) It is too per-

spicuous to admit of construction. To prosecute an action is one thing; to prosecute it in a particular name is another. It may be admitted for the sake of the argument, that it may be collected from the docket entries, that the District Attorney, or the State even, conducted the prosecution, subsequent to Annexation. But it was done in the name of the Republic of Texas. Is the difference unimportant? Whether it is unimportant or not, and whether a different provision would have done as well, were questions for the convention. Their judgment was that a proper organization required that "the style of all writs and process shall be 'The State of Texas;'" therefore, although a writ be obtained by the District Attorney, and command the officer to arrest an individual to answer the State of a charge, &c., it will not be valid, unless its style be "The State of Texas;" that is the name in which it sues. (Art. 4, Sec. 9.)

Their judgment was also, that a proper organization required further, that, "all prosecutions shall be carried on in the name and by the authority of the State of Texas," and conclude "against the peace and dignity of the State," therefore, it is not sufficient that a prosecution be carried on in the name, without the authority of the State. Nor is it sufficient, that a prosecution be carried on by the authority of the State, (that is by its officers, in its Courts, purporting to represent the State,) unless it be carried on in the name of the State. (Art. 4, Sec. 9.)

Compare the 9th Section of Article 4, which has just been quoted, and which relates to all prosecutions, with the 2nd Section of Article 13, which was first quoted, and which applies to prosecutions commenced under the Republic. See also Section 1st of Article 13, which declares, "that all pro- "cess, which shall be issued in the name of the Republic of "Texas prior to the organization of the State Government "under this Constitution, shall be as valid as if issued in the "name of the State of Texas."

In the ninth Section of Article 4, the words "in the name

and by the authority" were used.  As said before, this Section applies to prosecutions in general.  When the Convention came to make provision, in the 2nd Section of the 13th Article, for the continuation of prosecutions which had arisen prior to the organization of the State Government, why did they not say that they should be prosecuted to judgment and execution "by the authority of said State" instead of "in the the name of said State."  If they had done so, then the proceedings in such cases could have been continued in the name of the Republic by authority of the State, subject to other requirements of the Constitution, as to new process.  In that case these proceedings, subsequent to Annexation, would have been valid.  But the convention elected that all such prosecutions should " be prosecuted to judgment and execution in the name of said State."

When the State Government was organized " the Republic of Texas" ceased to be a name in which a criminal prosecution could be conducted.  All the proceedings in this case, subsequent to that event, were conducted in that name.  There was no proceeding in the name of the State of Texas.  The docket entries and papers filed are all styled " The Republic of Texas."  They show that the District Attorney, first Judicial District, appeared and conducted the prosecution ; and one entry says the State came by the District Attorney.  But it was all in the name of the Republic of Texas.  Suppose Annexation had not taken place ; the proceedings are all regularly conducted to judgment in the name of " The Republic of Texas," as was required by the 4th Section of the 4th Article of her Constitution.  Now, to say that they are also regularly conducted to judgment in the name of " The State of Texas," is absurd ; and is a conclusion which cannot be attained without ignoring the Constitution and the proprieties of language.

It is admitted that if this were a civil case between individuals, and the law provided for a similar change of the plaintiff in case of a transfer of interest, and the transfer of interest

appeared of record, but no corresponding change of parties, the assignee appearing and conducting the suit in the name of the original plaintiff, without objection by the defendant, the latter would not be heard to object for the first time in this Court, that the name of the plaintiff had not been changed, because he would be held to have assented and bargained that the suit might proceed in that name; but we apprehend that the course of argument by which such a decision would be properly sustained, would be entirely inapplicable and out of place in a case like this. The State will not suffer one of her citizens to be condemned to punishment for a public wrong, in any other name than her own, even with his own consent. Where constitutional law, the sovereignty of the State, public wrong and capital punishment all intervene, consent is out of the question.

II. The Court ought to have charged the jury as requested in the sixth charge asked on behalf of the prisoner. The charge which the Court substituted for it, is less perspicuous, and omits the important injunction to confine themselves to the evidence. The charge asked was as follows :

" If confining yourselves to the evidence which has been in-
" troduced and basing your reflections on that alone, a reason-
" able doubt should remain upon your minds, as to the guilt
" or innocence of the prisoner, it is your duty to acquit him."

The charge given was as follows :

" If the jury entertain a reasonable doubt of the guilt of
" the prisoner, they will give him the benefit of that doubt."

The one directed the jury to discard all rumor and preconceived opinion, and if a reasonable doubt remained upon their minds, to acquit the prisoner. This is the law, and the prisoner had a right to demand that it be put in his own strong language. The charge given is in broad terms, is vague, and addresses itself as well to the personal and preconceived belief of the jury, as to their judgments upon the evidence; and it concludes in language which may and may not have conveyed to the minds of the jury, the idea intended to be expressed.

To say they amount to the same, is to contradict the Judge who presided; and to say the jury knew that much law, is to appeal from the Judge to the jury on the law of the case.

III. The Court should have left it for the jury to say whether the prisoner was found by them to be sane or not. The previous trial of the issue of sane or not, was upon mere suggestion of counsel, and to avoid the reproach of trying a mindless creature for his life; its only effect was to decide that the prisoner was sane enough to be put upon his trial. On the main issue the object and effect of a finding as to the prisoner's sanity, goes to the punishment, and if found in his favor, restraint is substituted for capital punishment.

IV. The circumstances proved are wholly insufficient to sustain the verdict. The uninstructed mind will doubt and waiver, and overpowered by the tendency of its nature to come to a conclusion, will seize hold of the guilt or innocence of a prisoner, from which place of repose, no argument can dislodge it.

The experience of law and lawyers, on the other hand, has developed formulas to which the facts proved in any given case may be applied in order to determine whether they establish or fail to establish that moral certainty upon which only, men act affirmatively in matters of such grave concern.

"Evidentiary facts of a circumstantial nature are susceptible only of a very general arrangement, into two classes; "namely, first, moral indications, afforded by the relations, "and language, and conduct of the party; and, secondly, "facts which are apparently extrinsic and mechanical, and in-"dependent of moral conduct and demeanor." (Wills on Cir. Ev. 36.) "Connections and coincidences between the circum-"stances and hypothesis which they tend to prove, are either "those of a natural or mechanical nature, which are the ob-"jects of sense; or they are of a moral nature. Those of the "first class may consist generally in proximity in point of "time and space, and all other circumstances which show that "the supposed agent had the means and opportunity of doing

"the particular act, and connect him with it." (1 Stark. Ev. 562.)

Inculpatory moral indications are classified by Mr. Wills in his admirable work on circumstantial evidence, as follows: (Wills on Cir. Ev. 37 *et seq*:)

"Motives to crime." "Declaration of intention." "Preparation for the commission of crime." "Recent possession of the fruits of crime." "Unexplained appearances of suspicion, and attempts to account for them by false representations." "Indirect confessional evidence." "Suppression, destruction, fabrication and simulation of evidence." "Statutory presumptions."

It will not be argued by those who maintain this prosecution, that there are any circumstances proved in this case, which can come under any head of the foregoing classification, except "unexplained appearances of suspicion, and attempts to account for them by false representations." This language is descriptive of moral indications, without regard to whether the "unexplained appearances" be in themselves moral indications or being extrinsic and mechanical only, in their nature, become moral indications when connected with a failure to explain, where the prisoner may reasonably be presumed to be able to explain, or when connected with an attempt to account for them by false representations. In the case before the Court, there are no moral indications proved, unless they be found in the failure of the prisoner to explain the suspicious circumstance (an extrinsic and mechanical one) of his arrival at Virginia Point without the companions in whose company he had been seen the day before. This is the only circumstance which has not been explained, consistently with the innocence of the prisoner, by the evidence adduced by the State. The anxiety of the prisoner to get across the ferry at Virginia Point would be a slight moral indication requiring explanation, if the State had not explained it by the proof that the prisoner was on his way to New Orleans, and that the steamer for that place, was visible from the ferry, and was firing up when the prisoner ar-

rived there; the prisoner had been informed the day before by Mr. Power, that the steamer would leave that day; and the interval between the departures of steamers for New Orleans at that time was one or two weeks. What was said about the prisoner's casting his eyes back across the prairie is too vague, after such a great length of time, to be entitled to any weight. It is quite as plausible to suppose he was looking back to see whether his companions were coming, if he was innocent and ignorant of their fate, as that he was doing so, if he had just completed their murder. It does not appear from the testimony whether he inquired after his companions or not; but it must not be forgotten that Mr. Peaseley, the keeper of the ferry, with whom the prisoner doubtless had the first conversation, was not upon the witness stand. And we discard as unworthy of notice or further remark the testimony of Iams, that the pallet looked as if three men had lain on it. (Wills on Cir. Ev. 148, 149.) It is not testified by any other witness, and is too well calculated to be the conjecture of a mind preoccupied, to merit any consideration.

We have exhausted the catalogue of moral indications, and find only one in this case: that is the unexplained appearance of suspicion arising from the failure of the prisoner to account for his separation from his companions. It is not pretended that he ever attempted to account for the fact, by false representations. Before pursuing this part of the argument further, let us see what extrinsic and mechanical indications can be gathered from the evidence. Wills on circumstantial evidence reads, " The principal facts of circumstantial evidence, of an exter-" nal character, relate to questions of identity, (1) of person; " (2) of things; (3) of handwriting; and (4) of time; but " there must necessarily be a number of isolated facts which " admit of no more specific classification. (page 90.) Upon the same subject Mr. Starkie says, " Those of the first class " may consist generally in proximity in point of time and " space, and all other circumstances which show that the sup-" posed agent had the means and opportunity of doing the

" particular act, and connect him with it."   (1 Stark. Ev. 562.)

Mr. Wills does not discuss the separate effect of "proxim-
"ity in point of time and space, and other circumstances
"which show that the supposed agent had the means and op-
"portunity of doing the particular act, and connect him with
"it."   They are regarded by him as mere appearances of sus-
picion, and only become worthy of weight when they are unex-
plained, or when an attempt is made to explain them by false
representations.   (page 58.)   In this connection they become
moral indications, and are treated of by Mr. Wills under that
head.

Nor is there any difference between Mr. Wills and Mr.
Starkie upon the subject.   The latter, throughout his lucid
discussion of the principles of circumstantial evidence, de-
nominates mechanical indications as "imperfect and inconclu-
sive," (1 Stark. Ev. 563, 568, 570,) and insufficient when not
supported by some moral indications, to warrant a conviction.
That is the rule; it is partially conceded that there might be
such a congregation of mechanical coincidences, as would com-
pel belief.   The terms invariably connected together by Mr.
Starkie are "mechanical and inconclusive;" "moral and
conclusive."

The arrival of the prisoner at Virginia Point without his
companions is, at first, in the language of Mr. Wills "an ap-
pearance of suspicion" only; in the language of Mr. Star-
kie, "a circumstance of an imperfect and inconclusive na-
ture."   The probability is that they continued their jour-
ney together.   But if under similar circumstances the pris-
oner were upon the moment of being accused for the first
time, to become suddenly dumb, and if in addition there-
to he were unable to write, no Court would suffer a conviction
to stand.   Such a case is supposed for the purpose merely of
placing in a strong light the fact that it is the unexplained ap-
pearance of suspicion, only, which is admissible into the de-
nomination of circumstantial evidence.

Next, apply the rules as to unexplained circumstances of

suspicion, to the facts of this case. "As a general rule to " which the exceptions can be but rare, it is a reasonable con- " clusion, that an innocent party can explain suspicious or un- " usual appearances, connected with his person, dress or con- " duct; and that the desire of self-preservation, if not a regard " for truth, will prompt him to do so. The ingenuous and " satisfactory explanation of circumstances of apparent sus- " picion, always operates powerfully in favor of the accused, " and obtains for him more ready credence, when the explana- " tion may not be so easily verified. On the other hand, the " force of suspicious circumstances is augmented whenever " the party attempts no explanation of facts which he may " reasonably be presumed to be able and interested to explain." (Wills on Cir. Ev. 58.) "Allowance must nevertheless be " made for the weakness of human nature, and for the difficul- " ties which may attend the proof of circumstances of excul- " pation." (Id. 60.)

"Circumstances of the above description," (mechanical ones) "although they may be in themselves of an imperfect and in- " conclusive nature, frequently derive a conclusive tendency " from those which are of a moral kind, and which depend " upon a knowledge and experience of man as a rational and " moral agent. * * * * * * The presumption that a " man will do that which tends to his obvious advantage, if " he possess the means, supplies a most important test for " judging of the comparative weight of evidence. It is to " be weighed according to the proof which it was in the power " of one party to have produced, and in the power of the other " to have contradicted. If, on the supposition that a charge " or claim is unfounded, the party against whom it is made " has evidence within his reach by which he may repel that " which is offered to his prejudice, his omission to do so sup- " plies a strong presumption that the charge or claim is well " founded." (1 Stark. Ev. 563.)

The case is resolved into the question whether the circum- stances of proximity in point of time and space, and the arri-

val of the prisoner at Virginia Point without his companions, "derive a conclusive tendency" from the failure of the prisoner to introduce evidence to explain the latter circumstance; the proximity in point of time and space being explained consistently with the innocence of the prisoner, by the evidence for the prosecution. Under the circumstances of this case, and after so great a laspe of time, this can scarcely be made a serious question. It involves the requirement of proof of an *alibi*—after an interval of nine years—where the circumstances transpired in an almost uninhabited country. The language of the books is, "Whenever the party attempts no explanation of facts which he may reasonably be presumed to be able and interested to explain;" (Wills, 58) "in the power of one party to have produced;" "has evidence within his reach." (1 Stark. Ev. 563.) We submit that the prisoner could not reasonably be expected to introduce evidence to prove his separation from his companions, under the circumstances of this case, and after so great a lapse of time. His own explanation is that they separated this side of the Brazos timber, at a watering place. That this explanation does not appear in the record, the counsel for the prisoner trust will be sufficiently accounted for by the testimony respecting the sanity of the prisoner, coupled with the declaration of his counsel, that they could not, consistently with their notions of propriety, introduce for the purpose of explanation, a prisoner whom they conscientiously believe to be of unsound mind.

Again. Compare the facts proved with the rules which have been prescribed by experience, and which because of their importance and unyielding terms, are italicised by the most eminent writers on criminal law.

RULE 1. *The facts alleged as the basis of any legal inference, must be strictly and indubitably connected with the* FACTUM PROBANDUM. (Wills on Cir. Ev. 136.) There is no such connection between the circumstances of proximity in point of time and space and of travelling in company, and the FACTUM PROBANDUM. (Id. 137.)

Rule 4. *In order to justify the inference of legal guilt from circumstantial evidence, the existence of the inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt.* (Wills on Cir. Ev. 149 ; 1 Stark. Ev. 575.)

It is quite a reasonable hypothesis that they parted company, as alleged by the prisoner, and, the trail being obscure, came not by the same road ; and that the deceased came to his death by the hands of some one yet unknown. Such cases are not at all unfrequent.

Finally. Mr. Starkie states it as his first rule " *That the circumstances from which the conclusion is drawn should be fully established.* (1 vol. 571.) But in the first place all the facts which may be explained and are explained consistently with the innocence of the prisoner must be eliminated. (Wills, 150.) Such are all the facts consistent with the journey which Shultz is proved by the prosecution to have undertaken. In this view his immediate departure for New Orleans furnishes no evidence against him. And it would scarely be required of him, after so long an interval, to introduce evidence to account for his failure to return.

Under the operation of the rule under discussion, the attempt to prove that the deceased parties had money and that Shultz knew it, must be regarded as a failure. So also, the remark that it was the general impression, that Bateman had sold a tract of land to Shultz and was going on to receive the purchase money. Both of these facts, if true, could have been proved by the son of Bateman, who is shown by the testimony to have been in Court. And the remark about the general impression is not proper testimony at best. Iams' statement that the prisoner kept looking back and appeared much excited, is of the same character. It is obvious from all the testimony that nothing was remarked in the conduct of the prisoner, except a desire to get across in time for the steamer ; and it does not appear that his restlessness continued after he was informed that Mr. Wright was there and would take him with him in his

boat. The testimony of Iams respecting the appearance of the pallet, is vague and unreliable. It was late in the day, and the pallet was made by spreading of blanket coats. As said before, it was too well calculated to be the conjecture of a preoccupied mind, to deserve consideration. No other witness remarked it. It may be well to remember in this connection, that one man at least had passed by the place, and that a servant was sent out from Virginia Point and returned before the witnesses went to the spot. Nothing belonging to Shultz was found there ; and nothing belonging to either of the deceased parties is traced to Shultz's possession. On the whole our conclusion is that the evidence is insufficient to sustain the verdict.

*L. Sherwood*, also, for appellant.

*Attorney General*, for appellee. The first and second grounds of assignment may be considered together, as objecting that this case has not been prosecuted to judgment in the name of the State of Texas under the requirement of the 2d Section, 13th Article (Schedule) of the Constitution.

The 1st of these grounds is not supported by the record. The proceedings at the trial were " in the name of the State of Texas," in the sense of this constitutional provision. It is a matter of Law, that the Court " *in quo*," was and is a Court of the State of Texas, all *its* officers *her* officers, and all its proceedings " in her name," that is by her authority. It is obvious that the sole object of this provision of the Constitution was the substantial one of preventing the abatement, by change of Government, of pending criminal prosecutions and penal actions, and not the technical one of declaring a new plaintiff's name. It was to declare that these prosecutions which were pending under the authority of the Republic should be conducted to judgment under that of the State. If it had been intended that to carry into effect this provision, it should be necessary to change the style of pending criminal

cases on the dockets by suggesting the death of the Republic, and formally substituting the name of the State, this specific change in a matter of practice would have been specifically prescribed either in the Constitution or by the Legislature. It was " prosecuting this suit to judgment in the name of the State," in the sense of this constitutional provision, when the defendant, in the proper Court of the State of Texas, was duly called upon to plead to the indictment by the proper prosecuting officer, acting especially in the name and on behalf of the State ; when counsel, the very counsel now representing him, were assigned him by a Court of the State on the part of the State, when the special *venire facias* to obtain a jury for his trial was moved for and ordered and issued "in the name of the State;" when the whole proceeding of his trial and conviction were, in fact, conducted " in the name and by the authority of the State," by a Court of the State and the proper officers and jurors of the State. The record sustained this view of the proceedings. The essence of this point, in fine, is whether the appellant, having in fact had the benefit of the process of the State in his favor and all the other benefits which her laws, authority and power could confer on him in a fair and impartial trial, conducted under her authority, and in truth, "in her name," shall now on error for the first time be favorably heard to complain that the style of the case, on the docket below, was not changed from the Republic of Texas v. John Shultz. Finally, if this change of style be deemed necessary, as it is a matter of law, it can as well be made here as it could have been below, and it would be peculiarly proper to make it here, as it is here that appellant first complains of the want of it. (Drummond v. The Republic, 2 Tex. R. 156.)

3d assigned error. The charge of the Court here complained of is so plainly in all respects too favorable to the appellant, that I cannot consent to consider this imputed error.

4th assigned error. In excluding from the jury on the trial of the issue on the plea of not guilty, evidence of the insanity of the defendant (at the time of the trial.)

In any case this ruling would have been unquestionably proper upon this issue, that is, if the evidence were offered to affect the question of guilty or not guilty, as it must be under this issue ; but it is passing strange that the attempt in question should have been made, and that its failure should be complained of in this case in which, upon the suggestion of the defendant's counsel themselves, this question (of the sanity or insanity of defendant at the time of arraignment and trial) had been submitted upon a preliminary and separate issue to a jury and found against the defendant ; thus settling this question according to principle and authority.   (1 Arch. Crim. Pl., with Waterman's notes, 4, 5, in note referring to Rex v. Dyson, 7 C. and B. 305, &c., before J. Parks in 1831.)

5th and 6th assigned errors.   These grounds are certainly not worthy of consideration and discussion on the part of the State upon the facts of this enormous case.

*M. M. Potter*, also, for appellee.

Lipscomb, J.   At the Spring Term of the District Court for the County of Galveston and Republic of Texas, 1845, the Grand Jurors for the said county returned a true bill to an indictment preferred against the appellant, charging him with murder.   The appellant had left the country immediately after the alleged murder, and before the finding of the bill by the Grand Jury as stated above, and was not arrested until some time in the year 1853 ; and then, he was arrested in the State of South Carolina, and was brought back to Texas on the requisition of the Governor of Texas, and the June Term last, was tried before the District Court for the County of Galveston, and found guilty of murder in the first degree, by the verdict of the jury, on which verdict judgment of death was rendered from which judgment the prisoner appealed.

The first ground relied upon by the counsel for the appellant is, that the proceedings in the Court were not conducted as required by the State Constitution, and are therefore null

and void, and cannot be carried into effect. The offence was committed and the proceedings and the indictment, upon which the conviction was had, were before Annexation and the formation of the Republic of Texas into a State of the confederacy. The Constitution of the State, Art. 13, Sec. 2, provides " That all criminal prosecutions or penal actions, which " shall have arisen prior to the organization of the State gov- " ernment under this Constitution, in any of the Courts of the " Republic of Texas, shall be prosecuted to judgment and exe- " cution in the name of said State." It is alleged that the record in this case shows a disregard to the provision of the Constitution just cited ; that the proceedings were really and in truth conducted not in the name of the State, but in the name of the Republic of Texas.

In this, however, we believe the counsel for the appellant is mistaken. The indictment was found and returned under the Republic ; process was issued in the name of the Republic ; returned not executed ; the title of the case on the docket, as originally made, was the Republic of Texas v. John Shultz, and after the return of the *capias* not found, there was no judicial action in the case, until an application was made to the District Court of the State for an order for a writ of *venire facias*, to summon a jury to try the accused. This application was made in the name of the State, by the State's prosecuting officer, to the State Court, then in session. The *venire* was awarded and issued in the name of the State. We have said that after the return of the *capias* not found, there does not appear to have been any judicial action of the Court, until the application above stated was made by the District Attorney for a *venire*. The record exhibits, as transcribed from the docket, nothing but continuances, after that, without any new heading or statement of the case. The entry of the Republic of Texas against Shultz is made immediately preceding the application of the District Attorney for the *venire*, but neither the application nor the order have any reference to the statement so made by the Clerk, and the entry was not at all

necessary to be made, nor was there any necessity of making any statement of the case whatever, as the action of the Court makes no reference to any.  It was at most an unofficial act of the Clerk, that could exert no influence whatever on the proceedings of the Court, and the action then sought by the District Attorney for the State.  The same may be said in every other case where the prosecution has been designated by the Clerk, as the prosecution of the Republic of Texas v. John Shultz.  The clerical act of stating the name of the prosecution, cannot be regarded as the proceedings or the acts of the Court;  and perhaps, for the sake of convenience, that endorsement of the name of the prosecution, not of the proceedings or acts of the Court, was as proper and convenient as any other, because it was not necessary to the validity of the proceedings, that there should have been any statement.  We believe that in the action and proceedings of the Court, after the adoption of the Constitution, it was in the name of the State.

Secondly, it is contended that the Court erred in refusing to give the charge asked, and in the qualification with which it was given.  The prisoner's counsel requested the Court to charge the jury:  " If, confining yourselves to the evidence " which has been introduced and basing your reflections on " that evidence alone, a reasonable doubt should remain upon " your minds as to the guilt or innocence of the prisoner, it is " your duty to acquit him."  This charge was qualified by the Court in its general charge, and was, on that ground, not given as asked by the counsel for the prisoner.  The Judge instructed the Jury, in his general charge,  " if the jury entertain a reasonable doubt of the guilt of the prisoner, they will give him the benefit of that doubt."  The charge, as given, on the effect of a reasonable doubt, is in the precise language of many of the books of evidence.  The Judge may well have refused the charge as precisely asked, and preferred the adoption of the language used by him, because it was less complicated, and referred to doubts only, whereas the charge as asked

was double, embracing the duty of the jury in relation to the basis of their conclusion, as well as to the effect of a reasonable doubt.

As to the first part, where reference is had to another part of the general charge, which we will notice, it will be seen that the charge could afford no ground of complaint on the part of the prisoner, because it was more favorable to him than the law strictly authorized. It will be seen, from the facts proven, that there was no doubt as to the fact that the murder had been committed, and the only question was as to the perpetrator, and as to that, it rested on circumstantial evidence. The Court charged the jury : " It is essential that the circum- " stances proved should to a moral certainty actually exclude " every hypothesis that the act may have been committed by " another person, known or unknown." In this ruling the jury are instructed to base their opinion upon circumstances actually proven, and further, that if by any assumed hypothesis, the act may have been committed by another person, they cannot convict. This, though not the language of the charge, is its legal effect. We do not object to the first part of the charge as to proof of the facts ; it is strictly correct, and instructs them not to rely on circumstances not proven. The latter part of the charge, we believe to be wrong, though it was an error favorable to the prisoner. We believe that Mr. Starkie was the first to lay down the rule as given by the Judge, and he may have been followed by others. It is diffi- cult to believe that Mr. Starkie ever could have intended to be understood to mean " any hypothesis that could be ima- gined," but that his rule was carelessly and without reflection penned. We believe that the rule should be qualified by adding, any reasonable hypothesis consistent with the circum- stances and facts proven ; that the supposition that the act may have been committed by another person, must harmonize with the evidence. We believe, therefore, the prisoner had no ground of complaint against the charge of the Court.

The Court was clearly right in charging the jury, that they

had nothing to do with the question of the prisoner's then sanity. That question had been very properly previously submitted to a jury, as a collateral issue, and it had been found that he was sane. There was no question raised as to the sanity of the prisoner, at the time the murder was alleged to have been perpetrated.

The remaining is by far the most important question presented for our consideration. Is the evidence presented by the record, sufficient to support the verdict of the jury? We have before said that there is no positive evidence shown by the record, fixing the fact of the perpetration of the killing, upon the prisoner, and that if the verdict of guilty can be sustained at all, it will be on circumstantial evidence alone.

There has been a great deal written upon this branch of criminal evidence. It will be recollected by the senior members of the profession, that a book on evidence was published, with a ponderous appendix filled with cases, real or supposed, of the disastrous results of convictions based upon circumstantial evidence. It has never been supposed that this appendix of human frailty added anything to either the mass of professional knowledge, or to the cause of humanity, because the human understanding is and always will be imperfect and liable to erroneous conclusions. But we are bound to act from its dictates, however fallible they may be. It is admitted by all, that circumstantial evidence, when fully and conclusively made out, is sufficient to sustain a conviction for murder. The circumstance or circumstances must not be of a vague, indefinite, shadowy character, but the facts constituting the circumstances must be clearly defined and fully proved, and, in general, when so defined, the more there may be of them and the longer the chain connecting them together, the stronger and more confident will be the conclusion. To illustrate, in part, this proposition, by a reference to the evidence in the record: suppose that the evidence did not connect itself with the prisoner, further back than when he was seen with the murdered men by Mr. Power, the evening before, about twenty miles

from Virginia Point. He would appear to be a stranger, merely travelling to the same point, unconnected by any social relation or community of object, and therefore his being seen the morning after the murder, prosecuting his journey separate and apart from them, would not be so strong a circumstance of his guilt, and of his identity, as it will when connected with the previous facts of his having been in the employment for some time of one of the murdered men, being with him, and enjoying the friendly relations with him, his starting with him from Gonzales, with the object of going to New Orleans; when the chain is so connected, it would seem difficult for the candid human mind, in the absence of all explanation, to arrive at any other conclusion, than that the deed had been perpetrated by him.

There are other circumstances, besides: the fact of his appearing alone at Virginia Point the morning after the murder was committed, the fact of the mules of the murdered men being in sight from where he was at Virginia Point, and his anxiety and constant looking back in that direction, are all far from being light and immaterial. Now he must have known the mules belonging to his travelling companions, after travelling so far with them, yet no expression of surprise escaped him, that they had not come up. If innocent, he would have enquired the cause of such delay, because he had ample time to ride back a mile, the distance to the place where the men were murdered, however great his wish might have been not to lose the passage by the packet, because early in the morning, by sunrise, he was told the packet would not leave until the son of the Captain of the packet reached it, who was then present, and they did not leave until 10 o'clock, all of which time the prisoner remained outside of the house, refusing breakfast and coffee when offered to him, and manifesting the same anxiety and restlessness as exhibited on his first arrival, and never once saying anything about his absent travelling companions.

The circumstance too, sworn to by one of the witnesses, that

the bed made at the camp where the bodies were found, having been made for three persons, we consider as material. A person accustomed to camp, can form a very correct judgment, very often, from the appearance of the camp bed, how many persons occupied the bed. This may be apparent by the heading, and various other manifestations, that would escape the notice of one unaccustomed to such life.

Taking the circumstances all together, as proved, we can perceive no reasonable hypothesis, consistant with the facts proven, from which it could be inferred that the murder was committed by some other person known or unknown. And we find no error in the record. The judgment is therefore affirmed.

Judgment affirmed.