A. M. WHITE v. THE STATE.

No. 16963. Delivered April 17, 1935.
Rehearing Denied June 19, 1935.

62

HAWKINS, J., dissenting.

The opinion states the case.

*Tom F. Reese,* of Comanche, and *Arthur R. Eidson,* of Hamilton, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, thirty years in the penitentiary.

We find in the record twenty-eight bills of exception, each of which has been carefully considered. Bill of exceptions No. 1 complains of the admission in evidence of a conversation between one Lennie Cropper and Tipton on the night of the alleged murder. It is evident that if there was a conspiracy to kill and rob deceased, to which appellant and Tipton were parties, its object was to get the money of deceased Milton for the joint use of appellant and Tipton. Manifestly appellant had gotten no part of the proceeds of the robbery at the time of said conversation, and the conspiracy had not yet achieved its object, and what was said by one party thereto in furtherance of the object of such conspiracy if any, would be evidence admissible against the other. See Sapp v. State, 87 Texas Crim. Rep., 614.

We see no error in bills of exception 2, 3, 4 and 5 which bring forward objections to the court's charge on principals, which objections are unsound for the reason above referred to. If there was a conspiracy, clearly appellant was a principal offender, and if there was such conspiracy its object had not yet been attained, and the conspiracy would not be ended until such was the fact.

Bill of exceptions 6 complains of the refusal of a special charge, in effect, that Monte Sims was an accomplice and could not corroborate herself, and that one accomplice could not corroborate another, etc. There was but one accomplice witness in this case, and the special charge was manifestly erroneous. We see no substantial difference between the correct parts of this special charge and the charge given on the same subject by the court in his main charge.

We think the testimony of Monte Sims that Tipton left money with Shorty Cropper on the night of the killing to be carried and delivered to appellant the next day, was also admissible upon the theory that there was a conspiracy between appellant and Tipton which was not yet consummated. See Sapp v. State, supra.

We see no error in bill of exceptions 8. The transcript upon change of venue from Comanche county to Coryell county showed a proper order by the court directing said change of venue, upon agreement of both parties, on December 12, 1933; also that when the papers reached the office of the clerk of the district court of Coryell county the transcript was marked filed as of the date received, but such file mark was not put upon the indictment or other original papers when so received. The bill of exceptions reflects the fact that when attention was called,— the trial court ordered the file mark put on said papers as of the date they were received by the clerk of the court of Coryell county, which was prior to the convening of the trial term of the court below.

Bills of exception 9 and 10 seem not to call for any discussion. Bill of exceptions 11 complains of the testimony of the sheriff as to the caliber of the weapon used in shooting deceased. We fail to perceive any injury possible, and are of opinion the sheriff was qualified to give the answer shown.

Bill of exceptions 12 complains of the fact that the sheriff was permitted to testify that discs of powder penetrated the face, hands and skin of deceased, and that a man so shot would not fall in the position in which he found the body of deceased when he reached the place of the homicide. We see no material

error in this, if any. Appellant testified in his own behalf, and swore that when deceased was shot the man who shot him went right down on top of him. Appellant also testified that before the sheriff got there he had raised the head of deceased and rubbed his face, and put his hat under his head. In other words, it is quite evident that there was abundant opportunity for the position of the body of deceased to have been moved subsequent to being shot. Bill of exceptions 13 fails to show what the witness would have testified had he been permitted. Bills 14 and 15 seem to call for no discussion on our part. We perceive no error in the complaint in bill of exceptions 16. The witness was permitted to say that he took appellant to the office of Mr. Eidson in Hamilton, and that appellant told him when he returned he did not get to see Mr. Eidson. The proposed statement, viz: that the reason he did not get to see Mr. Eidson was because the latter was out of town,—would appear to be but hearsay. Bills of exception 17, 19 and 20 complain of the admission of testimony which was offered by the State upon the theory that there was a conspiracy, to which appellant and Tipton were parties, and that the conspiracy was not yet fully consummated,—hence the testimony was admissible. We can not agree with appellant's contention that any of said bills reflect error.

Bill of exceptions 18 presents objection to the testimony of Monte Sims upon the ground that she had been convicted of a felony and was confined in jail and not pardoned. The Legislature seems to have conferred the right of testifying upon parties who have been convicted of felonies and are confined in the penitentiary, or in jails. See Acts 39th Legislature, First Called Session, p. 20; Underwood v. State, 111 Texas Crim. Rep., 124.

Bills of exception 21, 22, 23, 24, 25 and 26 have been considered, but are not deemed of sufficient importance to call for discussion.

Appellant's bill of exceptions 27 is copied literally as follows:

"Be it remembered that on the trial of the above styled and numbered cause and while the witness John Reese, a witness for the State, was testifying on direct examination, at the instance of the State and over the objection of the defendant, the district attorney propounded to said witness, the following question.

"Q. 'Are you acquainted with the general reputation of the

defendant A. M. White in the community and town of Comanche as one of a bootlegger?"

"To which the defendant then and there objected and the court sustained the defendant's objection, and the district attorney, over the objections of the defendant, stated that 'We feel that your question as presented awhile ago is a material question, and one that would tend to shed light and assist the jury in determining the facts, that if this witness were permitted to answer—he has said he is familiar with his reputation as a bootlegger, because to show the theory of the State through this case that the defendant has two motives, or more in the highjacking and killing of the deceased P. H. Milton, for the reason that he knew the deceased carried money on his person, and desired to obtain a portion of that money by having him hijacked by Tipton and he further desired to have him killed, knew he would not hist and desired to have him killed; that he was a competitor in business, that of bootlegging, and that this witness would answer that his reputation is that of a bootlegger.'

"And the court sustained the objections to the question asked and stated at said time that it was not the proper question because the defendant's reputation was not in issue, and thereupon the defendant took his exception to the attempt on the part of the State to inject into the record a matter for the direct purpose and with a view to creating in the minds of the jury, prejudice against the defendant, and stated to the court at that time that the defendant wanted all of said matters to be shown and set forth in a bill of exceptions preserved at said time, all of which was allowed by the court."

In his brief appellant says that it was error for the court below to allow the State's attorney to make the statement above set out, in the presence of the jury,—after the court had sustained appellant's objection to the question propounded to witness Reese. In passing on this or any other complaint appearing in any bill of exceptions, this court must as nearly as it can, as ascertained from the recitals of the bill, put itself in what appears to have been the situation of the trial court in making the ruling complained of. In other words, does bill 27 show that the complaint intended was of the statement made by the State's attorney, and, if so, is it in such condition as to make the complaint one of merit, and one which should be regarded by us as calling for reversal of this case? Does said bill show that said statement was made in the presence of the jury? For many reasons we are impelled to answer in the

negative. If the members of this court find themselves in serious doubt as to whether the proof shows such statement to have been made in the presence of the jury, it would not appear to be difficult to conclude that the trial court may have concluded that it was not. We further observe that nothing in the bill appears to indicate that the court below felt itself called on to rule upon any objection made to any statement,—save that involved in the question asked to which the objection was sustained. We do not know from any recital in the bill whether the attorney approached the court and made his statement referred to, or whether it was made in the hearing of the jury. There is no affirmative statement either way, and we are left to conclude that the trial court knew that it was not in the presence of the jury. Apparently after the statement referred to was made, the court below "Sustained the objection to the question," and appellant then "took his exception to the attempt on the part of the State to inject into the record a matter for the direct purpose x x x of creating in the minds of the jury prejudice against the defendant." What does this mean? An argument to the court is in no sense *injected into the record*. This is all, and the only exception taken by appellant to the matter under discussion. The court was not asked to rule upon any objection to argument, nor was he asked to instruct the jury not to consider any argument. If we try to arrive at the court's understanding of the matter,—as evidenced by his ruling,—and what he said in that connection, it would appear that he understood appellant's objection and exception to be directed at something which the State was trying to *inject into the record*, and accordingly he further sustained appellant's objection to the question asked, and said nothing regarding the statement made by the attorney, for the evident reason that he did not feel himself called on to make any statement regarding same, which situation is much in line with what we said in Salinas v. State, 18 S. W. (2d) 663, speaking of an argument made: "Possibly to the court, possibly to the jury." We can not tell as the matter is left to conjecture.

Bills of exception complaining of argument, as well as other matters, must be so exact and definite within themselves as to manifest the error complained of. See Texas Jur., Vol. 4, p. 261. The first case cited in support of the text just mentioned is Salinas v. State, supra, in which discussing the refusal of a special charge, we said in the opinion, "Reflects the fact that the assistant county attorney said in argument: 'I want to call to your attention that rarely in a court of justice have I ever seen

a man apply for a suspended sentence when he was not guilty,'—used language as follows: "We are not apprised in any way as to how many arguments were made in the case, nor at what time in the course of the argument said assistant county attorney spoke, nor what led to the making of the remark. These matters are left to conjecture. All we know from the record is that, while the assistant county attorney was speaking —possibly to the court, possiby to the jury—he made the remark set out in the charge referred to, and, further, that before the jury retired at the conclusion of the argument, the special charge under consideration was presented to the court, and was then refused."

Later in the opinion it is said: "Manifestly for an attorney to make a statement, possibly in reply to some suggestion of the other side, or in some discussion before the court, or under circumstances justifying or excusing same, but to which no objection is offered to the argument until the case is concluded, perhaps that day, or in many instances some later day, at a time when neither the court nor the attorney can adequately recall or state the facts pertaining to the argument, or adequately explain or withdraw or modify same, is unfair, and should not be tolerated."

There are other rules equally well settled which apply. If appellant made an objection directed at the rather lengthy statement of the State's attorney above quoted, it was what might be termed a blanket objection,—not specifying any part of same as that to which he expected as likely to create prejudice. As we view it, the greater part of said statement is not open to any such imputation. The rule is that in objecting to argument the particular part deemed a proper subject for such objection should be pointed out, and if not so the bill of exceptions presenting the complaint would not call for consideration. See McKenzie v. State, 11 S. W. (2d) 179; Moore v. State, 107 Texas Crim. Rep., 290; Rowan v. State, 97 Texas Crim. Rep., 130; Newman v. State, 99 Texas Crim. Rep., 323; Nelson v. State, 99 Texas Crim, Rep., 564; McVicker v. State, 100 Texas Crim. Rep., 598; Gray v. State, 109 Texas Crim. Rep., 481. As said by us in Blackmon v. State, 95 Texas Crim. Rep., 124: "There may have been some statements testified to by the witness Champion as made by deceased that could not be classed as coming within a res gestae declaration. However, no objection appears to have been made specifically to any particular part, but the objection went to the entire statement. As made it was not tenable."

There is another well setted rule which has application. There must be written request of the trial court to have the jury instructed not to consider argument deemed objectionable. Watson v. State, 105 Texas Crim. Rep., 152; Page v. State, 104 Texas Crim. Rep., 63; Tarver v. State, 108 Texas Crim. Rep., 655; Rambo v. State, 96 Texas Crim. Rep., 387; Ferguson v. State, 95 Texas Crim. Rep., 212; Smith v. State, 92 Texas Crim. Rep., 446; Shaw v. State, 89 Texas Crim. Rep., 205. When no request for such instruction is made, this court will not reverse for argument unless it be manifestly of such necessarily hurtful character that we conclude an instruction not to consider would have been of no avail. In determining this issue, we have in mind the whole case, including the testimony and the verdict. As said by this court in McCall v. State, 18 S. W. (2d) 175, in discussing the reversible character of a statement made in argument by the district attorney,— who said "If you convict the defendant he has a right to appeal and review the judgment of the court,"—and after a discussion of certain cases wherein a somewhat similar remark was held ground for reversal: "The statement should not have been made by the district attorney, but doubtless before it was made every man on the jury knew that if appellant was convicted he could obtain a review of his case. In Vineyard v. State, 96 Texas Crim. Rep., 401, 257 S. W., 548, this court said: 'We think the only safe rule to be that this court should not hold an argument to be reversible error unless it is in extreme cases where the language complained of is manifestly improper, harmful, and prejudicial, or where a mandatory provision of the statute is violated, or some new and harmful fact injected into the case. Stanchel v. State, 89 Texas Crim. Rep., 358, 231 S. W., 120; Henderson v. State, 75 Texas Crim. Rep., 66, 172 S. W., 793; Bowlin v. State, 93 Texas Crim. Rep., 452, 248 S. W., 396.' In the opinion on rehearing in the same case Judge Morrow said: 'In deciding whether the argument is of a nature demanding a reversal of the judgment, the language used is not alone the test. The evidence and the verdict must be considered. Hart v. State, 57 Texas Crim. Rep., 21, 121 S. W., 508; Ex parte Davis, 48 Texas Crim. Rep., 644, 89 S. W., 978, 122 Am. St. Rep., 775; Borrer v. State, 83 Texas Crim. Rep., 198, 204 S. W., 1003.' "

Applying these rules to the case at bar, what have we?

The question asked Reese was at practically the end of the testimony. It had been testified to that deceased was a bootlegger; that Shorty Cropper, at whose house in Hamilton the

State claimed appelant and Cropper with Tipton formed the conspiracy to kill,—was also a bootlegger; that Tupin, with whom appellant went to Hamilton on the day before the killing, was, in the language of appellant, engaged to sell appellant liquor that night,—and was looking for a shipment,—and thus shown to be a bootlegger; that Wiesendanger, who was with appellant at the home of Milton, deceased, at the very time of the homicide,—was there to get jointly with appellant a half gallon of whisky, of which Wiesendanger said he would sell part the next day, thus evidently classing him as an illicit seller of liquor; that the very bill under discussion recites that the witness Reese had said he was familiar with appellant's reputation as a bootlegger,—such statement appearing presumably in some other part of his testimony; that appellant was shown to have consorted with these proven bootleggers, and to have followed oil fields, and to have lived at Comanche for a number of years, with very slight showing as to how he made a living,—was all before this jury for what it was worth as reflecting the true business and character of this appellant. As Judge Morrow said in the case last above referred to, and in line with what Judge Hawkins said in the same case, we would look at an argument complained of in the light of the testimony and the whole record and the verdict in trying to determine, from our standpoint as an appellate court, whether same be of such harmful nature as to have injected new and hurtful issues, or to have created prejudice, and unless we could overlook all the many obvious objections to this bill, and what was said and done in the light of the whole record,—we would not feel inclned to believe the statement of the attorney, even if made in the presence of the jury, and if such as it could be considered,—such as would call for reversal.

Appellant's chief ground of complaint in this case is that there is not sufficient testimony corroborating the accomplice Monte Sims. There is no question but that appellant was present at the time of the alleged homicide, and he was convicted herein upon the theory that he was a coconspirator with Tipton, the man who fired the fatal shot, and that Monte Sims was an accomplice to said kiling. In order that our views might be understood it will be necessary to set out at some length the testimony.

By witnesses other than the accomplice the following facts were established: Tipton shot and killed Milton. The killing was done about 8:30 P. M. in a street in front of Milton's house, from which house he had just come to the car of appellant with

a jar of whisky. Said house was located in the little city of Comanche, some three-quarters of a mile from the public square. Appellant and one W had driven up to a point in front of the home of deceased, had called him out, and asked him to sell them a half gallon of whisky. The night was dark and cloudy. When deceased approached appellant's car, the latter turned off the car lights. At this juncture Tipton appeared from behind said car with a pistol and commanded them to stick up their hands. Deceased was outside the car and appeared to be slow in getting his hands up, and Tipton shot him. Deceased fell beside the car, and Tipton ran his hand into the bosom of deceased and got something, went around the car and fled. Deceased had $215.00 in the bosom of his shirt before the occurrence. This money was found to be gone afterward. No effort was made by Tipton to rob either W or appellant,—or apparently to get from the body of deceased any money or valuables in any other pocket or part of the clothing of deceased.

Deceased kept his car in a garage near the house. In the car he kept a shot gun. Examination of the car that night after the shooting revealed the fact that the glass door of the car had been broken and the shot gun was gone. The next day it was found in some bushes across the road. Lennie Court, who had been the wife of appellant's brother, lived with Shorty Cropper in Hamilton, thirty-six miles from Comanche. At the time of this trial she had married Shorty and is herein referred to as Lennie. On the day before the night of this killing, Tipton and Monte Sims appeared at Lennie's house in Hamilton. The same day appellant and Tupin went from Comanche to Hamilton and up to Lennie's house. Tipton, appellant and Cropper were together at said house. Appellant and Tupin returned that afternoon to Comanche. The two got to Hamilton, according to Tupin, just before noon. Appellant testified that they left about 2 P. M. to go back to Comanche. On the way back appellant observed to Tupin that Pink Milton (deceased) flashed so much money that he was going to get robbed some time. While in Hamilton appellant tried to pawn a shot gun and a rifle which he had carried over from Comanche. After getting back to Comanche appellant engaged a half gallon of whisky from Tupin, at the house of the latter, this engagement being made, according to Tupin, between sundown and dark, but Tupin said appellant did not come back to his house afterwards for it. Some time in the afternoon after appellant and Tupin got back to Comanche they went to W's house, and appellant there told W he would be back to see him later. He did

show up at W's house about 8 P. M., according to W. They then went to Milton's house where the killing occurred in a few minutes.

Lennie Cropper swore that about 5 P. M. on said day Monte Sims and Tipton left her house going toward Comanche. They came back about midnight that night and stayed a short time. Tipton told her he had killed a man,—had to kill him. Monte Sims took "The money out of her bosom and gave it to him, and he counted it, and then he told how he killed the fellow in Comanche." He said he first got a shot gun out of the fellow's car and threw it in some bushes, and when this fellow came out of the house he ran up to him and told him to "Stick them up." He said there was a car at the front, and that the fellow he killed had come out to the car, and he told him to stick them up, and that all the time he was coming up with one hand; he was pulling a gun with the other, and he told deceased "Don't shoot," and the fellow shot at him, and he shot the fellow, and stuck his hand in the fellow's bosom and got his money, and that he run off and back to his car, and went out to a pasture and got lost,—threw the gun away, went right through Comanche and on to Hamilton and to her house. She further testified that next morning she and Cropper went to Comanche and had a conference with this appellant, after which they went back to Hamilton.

A witness testified that on the night of the killing a man and a woman in a car came to appellant's house inquiring for him, but were told he was not there. This was about 7 or 7:30 P. M. Another witness testified that on the night of this killing he saw appellant near Renfro's market on the public square in Comanche, and later about dark saw appellant in a car with a man and woman who were unknown to witness, going across the public square north in a car together.

Appellant denied being in a car on the public square of Comanche that night with a man and woman. He explained his going to Hamilton as in furtherance of his desire to get a political job; also denied that he and W went to the house of deceased save to get whisky that night of the killing. He claimed that he had gone to Tupin's for whisky he had engaged, and said Tupin did not have it. He explained about turning off his car lights at the time and place of the killing by saying that W told him he had better turn off the lights. He later said he had been up there once before and that Milton told him "Whenever you come up here turn the lights off." Asked if another reason for turning off his lights was that he did not want W to see and

observe the man who was going to do the hi-jacking, appellant replied that the only reason he turned his lights off was that Milton told him to turn his lights off whenever he came there. He admitted that the man who shot Milton made no effort to rob him and W, and also said that the man while robbing the body of deceased did not look up to see if they had guns. He testified he lived in Comanche and had never seen Tipton until that day. Sheriff Brightman also testified that Tipton did not live in Comanche and was a stranger up there. The substance of the testimony of Monte Sims was that on the morning of the day of the killing she and Tipton drove from Big Lake to Hamilton and to the house of Lennie Cropper. The two women went to another house. They came back in the afternoon. Shorty Cropper was then at the house. About 5 P. M. Shorty and Lennie left in a car. About the same time Monte and Tipton left in their car and drove to Comanche, where they arrived about 7 or 8 P. M. They drove around trying to find this appellant, going first to his home where some girls were in the yard. Tipton asked if Mr. White lived there, and some one said yes. He asked if White was there at the house. Some one called to a lady and asked if he was there, and they said "No, we would find him around Renfro's market." She and Tipton drove down town and found appellant at the side of Renfro's market. He got in the car with them and drove out with them to show them where Milton lived. Tipton did not know where deceased lived. They drove by the house twice, and appellant pointed out the house, the garage and a ditch. They then drove out to where a gate went into a pasture and here they stopped and talked. Appellant descrbed Milton to Tipton, and told Tipton that he (appellant) would come up in his car and leave the lights on so Tipton could see Milton, and if he was the right man he would knock his lights off and then turn them on again. Appellant also told Tipton that Milton did not carry a gun, and would "Histe" easy, and that if he did not "Histe" easy to shoot him as he did not carry any gun at all, but had a shot gun in his car, and for Tipton to get it, that appellant wanted it. Appellant told her and Tipton to then come out to this gate in the pasture and wait until he (appellant) could get out there. Appellant said several times that Milton did not carry a gun, and had been "Histed" before and would "Histe" easy. Appellant also said he would get somebody else to go with him who would not know anything about it,—would pick up a boy and bring him along with him. He showed the woman and Tipton where to park their car. They then drove him back to

town and let him out, and she and Tipton drove back to the place where appellant showed them to park their car, and here Tipton got out and walked back and she stayed in the car. Tipton was gone about a half hour. When he came back he gave her some money, but how much she did not know. They then drove back to the gate mentioned where appellant was to meet them and divide the money gotten from Milton. They drove in this gate but decided not to wait. They drove out and down to the edge of Comanche, where they threw away the shoes worn by Tipton, and then came on to the square, got on the Hamilton road and drive to Hamilton and out to Lennie Cropper's, where they stayed not over forty-five minutes, and then drove to Austin, where they filled up with gas and then went on to San Antonio. While they were at Lennie's that night, after coming back from Comanche, Tipton gave to Shorty Cropper part of the money he got from deceased to give to appellant. The money Tipton had was something over two hundred dollars in all, but she did not know how much of the money he gave to Cropper.

It is well settled that the State need not corroborate its accomplice witness upon all of his testimony,—indeed the requirement of the law goes no further than to demand that there be testimony other than that of the accomplice which in and of itself tends to connect the accused with the crime alleged. That the corroboration can be by circumstances seems also well settled.   See Boone v. State, 90 Texas Crim. Rep., 380; Edwards v. State, 77 Texas Crim. Rep., 654; Rowan v. State, 97 Texas Crim. Rep., 130; Stepp v. State, 92 Texas Crim. Rep., 325; Chandler v. State, 89 Texas Crim. Rep., 597; Lamb v. State, 101 Texas Crim. Rep., 557; Minor v. State, 108 Texas Crim. Rep., 1; Belot v. State, 121 Texas Crim. Rep., 524.

We have here a murder committed in the perpetration of the offense of robbery,—the deceased at most an obscure bootlegger living in the outskirts of his home town,—killed and robbed by a stranger.   The setting of the crime seems to force the conclusion that some one with knowledge acted with Tipton. Was appellant this person? He was familiar with the location of Milton's house and with Miton's habits of having on his person large sums of money. They lived in the same town. By non-accomplice witnesses it was shown that he met Tipton at Hamilton the day of the murder, and met him at the home of his former sister-in-law. Appellant was in Hamilton only about two hours. On the way back to Comanche he suggested to his companion that Milton was going to be robbed; Milton was

robbed and killed that very night by the man Tipton,—whom the jury may have been justified in believing that appellant had gone to Hamilton that day to see.

The accomplice testified that when she and Tipton got to Comanche in the late afternoon of that fatal day, they tried to contact appellant, and for that purpose went to his house and inquired of some girls in the yard if White lived there and was at home; they were told that he lived there, but was not at home but was down around Renfro's market. She further testified they went to Renfro's market, found appellant and took him in their car to show them where deceased lived. She is corroborated by a girl who was in White's yard on said night, and also the man on the public square who saw appellant going across the square that night in a car with a strange man and woman.

The accomplice testified that appellant showed them the home of deceased and the garage by it, and told them deceased kept a shot gun in his car in the garage, and that he, appellant, wanted this gun. That very night after the killing it was found that the garage had been entered, the door of his car broken, and his shot gun taken. The gun was found the next morning in some bushes across the road. That night, at Hamilton, in describing the occurrence to a non-accomplice witness Tipton told her that he broke the door of the car of deceased, got the gun and threw it in the bushes. The facts in this record further show that no opportunity for contact of appellant and Tipton, at the pasture gate after the gun had been so taken, was afforded.

The accomplice also testified that appellant told her and Tipton that he would turn off his car lights as a signal to Tipton that the right man had come to the car. By non-occomplice witnesses,—in fact by appellant himself,—proof was made that when deceased came to the car, the car lights were turned off,—Tipton promptly appeared and robbed the very man,—and also killed him,—and him alone, exactly in accordance with what the woman testified was the set up of the conspiracy. She testified that appellant told Tipton that if he did not "Histe" easy, shoot him. Appellant attempts to explain why he did turn off his lights, giving contradictory explanations, but the jury did not have to accept his explanation.

Again, the accomplice testified that as part of the conspiracy appellant said he would take with him to the place a party who would know nothing of the plot,—and enter Mr. W who testified that about 8 P. M. appellant came to his house, having

previously told him that he would see him later, and that about 8:15 P. M. he and appellant drove to Milton's house, where evidently Tipton was waiting and the tragedy was enacted.

Did appellant really want whisky that night? Tupin testified that appellant had asked him to get for him, appellant, a half gallon of whisky late that afternoon, and Tupin testified that he did get it for appellant but that appellant did not come for it. Again, and significantly, the killer and robber, though a stranger, did not waste time on the two men in the car, or in searching in pants pockets of the dead man, but when Milton fell, Tipton thrust his hand into the bosom of the shirt of his victim where he found $215.00 and fled.

Monte testified that they drove at once to the pasture gate where they were to meet appellant and divide, but he was not there, and they,—evidently afraid to wait,—drove back to the house in Hamilton, where inference suggests the plot was laid; and here Lennie testified Monte took from her bosom and gave to Tipton "The money." Monte further testified that here Tipton gave to Shorty Cropper appellant's half of the loot, with instructions to take it to Hamilton the next day and deliver it to appellant. For some reason Shorty Cropper and Lennie drove some seventy-two miles to Comanche and back the next day, and as far as this record reflects saw no one in Comanche save this appellant. Cropper attempted to explain this trip by saying that he went to tell appellant that he could not wait longer on him but would go on to Austin without him to see about a job. As a witness in his own behalf appellant's testimony, however, makes plain the proposition that Cropper had no thought of going to Austin for a job until appellant told him in Hamilton that he himself was applying, and Cropper then asked appellent if he thought he might get on. Also that after going to Comanche to see appellant the day after the killing, Cropper did not go at any time to Austin for a job but instead went through Austin and on to San Antonio.

The case is by no means free of difficulty, and the record has many angles, but as we view it, the facts and circumstances amply support the conclusion of guilt and corroborate the accomplice.

Finding no error in the record, the judgment will be affirmed.

HAWKINS, J., dissents.

*Affirmed.*

HAWKINS, JUDGE (dissenting).—Bill of exception number

twenty-seven is set out in the opinion of Judge Lattimore and it is not necessary to copy it again. The first part of the bill shows that in the direct examination of a State's witness counsel for the State asked witness if he knew the general reputation of appellant as a bootlegger. The court sustained objection to the question and stated at the time that is was not a proper question because appellant's reputation was not in issue. The balance of the bill relates to the reasons urged by the district attorney as to why he thought the evidence admissible. The bill does not show that any objection was urged to the statement of the district attorney. In other words, the trial court seems not to have been called on to make any ruling on that matter. It does appear from the recitals in the bill that counsel for the State thought that because it was the theory that appellant was a bootlegger, one motive for the killing was to remove Milton as a competitor. If the circumstances had justified the State in proving that Milton was a bootlegger— and this is not conceded—the State could not have established it by proving such to be his general reputation, and his reputation in that regard had in no way been put in issue. The trial court recognized the question as improper, and so ruled. So the question squarely before us is to say; what was the effect of the question, regardless of the court's action in sustaining the objection to it, and stating—presumably in the jury's presence—that the question was improper? Under the circumstances this court is not justified in holding the error harmless. It is an incident to be regretted, yet a distinction cannot properly be drawn between the present case and Childress v. State, 92 Texas Crim. Rep., 215, 241 S. W., 1029; Harrison v. State, 102 Texas Crim. Rep., 385, 278 S. W., 430; Farar v. State, 112 Texas Crim. Rep., 199, 15 S. W. (2d) 1050; Day v. State, 117 Texas Crim. Rep., 173, 34 S. W. (2d) 871; Coon v. State, 117 Texas Crim. Rep., 158, 35 S. W. (2d) 419; Wall v. State, 117 Texas Crim. Rep., 327, 37 S. W. (2d) 750; Long v. State, 119 Texas Crim. Rep., 270, 43 S. W. (2d) 932; Hollingsworth v. State, 122 Texas Crim. Rep., 545, 56 S. W. (2d) 869. In the Childress case (supra) we said: "We frequently decline to reverse cases where improper questions were asked and objections were promptly sustained; but we can scarcely conceive a question which in and of itself could be more hurtful to an accused than one calling for an answer which would put in issue his general reputation. It places him in the unfortunate attitude of having to let the question pass unchallenged, thereby permitting the State to do what it plainly has no right to do,

or of objecting thereto in the presence of the jury, leaving the very natural impression upon them that he feared an answer would have been detrimental to him."

In Farar's case (supra) the language in the Childress opinion was quoted with approval. In Coon's case (supra) the holding in Childress' case (supra) was approved, and the court said: "We cannot gauge the evil effect upon the jury of such improper question. The appellant was not given the lowest penalty."

In Long's case (supra) de declined to reverse, assigning our reasons in the following language: "If there had been an issue drawn by the evidence as to the possession by appellant of the whisky for an innocent purpose, or if he had received punishment above the minimum, this court would unhesitatingly have reversed the judgment because of the error shown by bill of exception number one. However, no issue was made in the evidence of the purpose for which appellant possessed the whisky. Art. 671, P. C. makes proof of the possession of more than a quart of intoxicating liquor prima facie evidence of guilt. Appellant introduced no evidence showing the legality of such possession. Under the circumstances, the jury could do nothing less than find appellant guilty, and, having assessed the lowest punishment, we feel unauthorized to reverse, notwithstanding the error pointed out."

The trial court ruled that the question asked by the district attorney was improper. This court says it was wrong, but we are asked to hold it not hurtful in the face of a verdict for many years above the minimum. I cannot assent to the conclusion reached by my brethren on the point mentioned, and respectfully note my dissent.

### ON MOTION FOR REHEARING.

MORROW, Presiding Judge.—In his motion for rehearing appellant insists that Bill of Exception No. 8 reflects reversible error in that it is shown that the special venire was prematurely drawn. The bill recites in effect that appellant insisted that the court was without jurisdiction because the order changing the venue failed to reflect a judgment of the District Court of Comanche County declaring a mistrial. Further, it was urged that the indictment had not been filed in the District Court of Coryell County. The bill embraces a statement to the effect that appellant showed the court that the special venire was drawn before the record was received from Comanche County.

We quote from the bill as follows: "And be it further remembered that the defendant insisted that the District Court of Coryell County, Texas, had no juridiction to enter any orders in this case, and that all orders made and entered, are and were void, and if not absolutely void, such preliminary matters as required by the statutes are now before the court and called to its attention before the announcement of ready, and an objection timely lodged to the jurisdiction of the court."

The bill of exception is qualified to show that the clerk failed to place his file mark on the indictment and other original papers at the time they were received, and that the court ordered said papers filed as of the date they were received, which day was prior to the convening of the January term of the District Court of Coryell County, at which appellant was tried. The caption shows that the court convened on the 8th of January, 1934. The clerk's certificate to the transcript of the proceedings incident to changing the venue bears date the 12th of January, 1934, and embraces a recital to the effect that the original papers accompanied said transcript. Manifestly, the court's qualification to the bill of exception contradicts the record as to the time the transcript was forwarded to the District Court of Coryell County. However, the trial was held on the 16th of February, 1934, which was several days after the transcript and original papers had been received. The order changing the venue recites that there had been a mistrial in Comanche County, and embraces a sufficient recital of the reasons of the trial judge for changing the venue. The order is in proper form and the indictment and other original papers were on file in the District Court of Coryell County at the time the trial began.

Appellant's objection to proceeding with the trial on the ground that the court was without jurisdicion is not tenable. If it should be conceded that the bill of exception is sufficient to show that the special venire was drawn two days prior to the time the transcript was received, it is observed that appellant made no effort to have the venire quashed or set aside. He contented himself with interposing objection to the jurisdiction of the court. But he insists that the matter presents fundamental error. It is well settled by the decisions of this court that unless a motion to quash a special venire is timely and properly made, objections to the drawing thereof are waived. Kinch v. State 156 S. W., 649; 26 Texas Jur., 638. In Buie v. State, 1, Texas App., 452, it is shown that the accused moved for a new trial on the ground that the jurors impaneled

to try him, and who did try him, were not the regular jury summoned for the term, and because none of the regular jurors were first called or challenged. In concluding that the question was raised too late, the court said: "The objection, in view of these facts, is not tenable. Defendant did not, it appears, challenge either the array or the particular jurors, * * * but accepted the jury as summoned. He, by this course, waived any rights he might have had, and cannot now be heard to complain. Nor could such an error, if such it was, be reached by motion for a new trial."

In the present case, as already pointed out, appellant merely challenged the jurisdiction of the court. He made no effort to have the special venire set aside and appears to have objected to no jurors on the ground he now urges. We are unable to uphold the contention that fundamental error is presented.

Bill of Exception No. 7 shows that the trial court declined to instruct the jury to disregard the testimony of Monte Sims to the effect that R. C. Tipton left some money with Cropper to be delivered to appellant. In this connection, the court instructed the jury to disregard said testimony if they failed to believe beyond a reasonable doubt that appellant had conspired with Tipton and Monte Sims to kill or rob the deceased. It is appellant's contention that Monte Sims' testimony alone established a conspiracy. We reached the conclusion in the original opinion that the testimony was sufficient to corroborate Monte Sims, who was an admitted accomplice. If such conclusion was correct, the trial court was not in error in declining to give the requested instruction. We quote from Steele v. State, 223 S. W., 473, 87 Texas Crim. Rep., 588, as follows: "It is not necessary that a conspiracy be established *aliunde*, before the acts and declarations of the co-conspirators, made in the absence of the accused, become admissible in evidence. If such were the rule, there would be no need for admitting against the accused on trial such acts and declarations of co-conspirators. The case would be already made out. We are of opinion, however, that there must be testimony other than that of declarations of co-conspirators, which will tend to show an acting together of the parties, and unless there be such evidence other than such declarations, the conspiracy is not made out. We also think that in every case where the issue of conspiracy is contested the trial court must affirmatively charge the jury that they must not consider as against the accused on trial, the acts and declarations of the alleged co-conspirators, unless it be shown beyond a reasonable doubt that there was in fact a conspiracy

or an acting together of said parties in such criminal enterprise. Arnold v. State, 9 Texas App., 435; Dungan v. State, 39 Texas Crim. Rep., 115; Luttrell v. State, 31 Texas Crim. Rep., 493; Serrato v. State, 74 Texas Crim. Rep., 413, 171 S. W., 1133."

We are constrained to adhere to our original conclusion that the accomplice Sims was sufficiently corroborated. It follows that Bill of Exception No. 7 fails to reflect error.

Our discussion of Bill No. 7 is also applicable to the matter brought forward in Bill of Exception No. 17.

It is insisted that we erroneously disposed of Bill of Exception No. 27. Said bill was thoroughly considered originaly as Judge Hawkins entertained the view at the time that it reflected reversible error. After a careful re-examination of the bill in the light of the motion for rehearing we are constrained to adhere to the conclusion stated in the original opinion.

A careful examination of the record in the light of the motion for rehearing leads us to the conclusion that the judgment of affirmance should be sustained.

The motion for rehearing is overruled.

*Overruled.*