## Jim Pope v. The State.

### No. 4401.   Decided March 21, 1917.

**1.—Theft of Cattle—Accomplice—Corroboration—Charge of Court.**

Where, upon trial of theft of cattle, the conviction depended largely upon accomplice testimony but was corroborated by other testimony, circumstantial and otherwise, to connect the defendant with the theft, and the court submitted a proper charge thereon, there was no reversible error.

**2.—Same—Evidence—Credibility of Witness—Practice.**

Where, upon trial of theft, after the State's main witness had testified fully as to the defendant's guilty connection with the theft, he was asked by the district attorney when he first told anything about this, which he answered over the objection of the defendant, that he had told a certain party on a certain day about the transaction, there was no reversible error, even if it could be construed that the witness testified on a previous occasion to the same thing, as he was afterwards attacked by the defense as testifying falsely; although this may have been premature. Following Knight v. State, 144 S. W. Rep., 967, and other cases.

**3.—Same—Evidence—Explanation by Witness.**

There was no error, upon trial of theft of cattle, that the State's witness testified that he was afraid not to enter into the transaction by threats from the defendant and others, and that he did not voluntarily enter into the theft.

**4.—Same—Evidence—No Injury Shown.**

Upon trial of theft of cattle, there was no error in permitting the district attorney to ask a State's witness whether he had found anyone inquiring for the alleged cattle, to which he answered in the affirmative, in the absence of any injury shown to the defendant.

**5.—Same—Evidence—Bill of Exceptions.**

Where the bill of exceptions did not show that testimony as to other transactions was in fact introduced, there was no error.

**6.—Same—Evidence—Moral Turpitude—Judgment.**

Where, upon trial of theft of cattle, the chief witness for the State was attacked by the defense as having been convicted of a misdemeanor involving moral turpitude, there was no error in permitting him to explain the circumstances and show that, while he was really convicted, he was not guilty, and there was, therefore, no error in excluding the judgment of conviction, afterwards sought to be introduced by the defendant.

**7.—Same—Objections to Charge of Court.**

In the absence of separate bills of exception to any particular charge of the court, the same can not be considered on appeal; besides, there was no error in the charge of the court.

**8.—Same—Charge of Court—Requested Charges.**

Where, upon trial of theft of cattle, the evidence did not raise the issue set forth, in the refused requested charges, there was no reversible error.

Appeal from the District Court of Bowie. Tried below before the Hon. H. F. O'Neal.

Appeal from a conviction of theft of cattle; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*R. H. Jones & Mahaffey* and *Keeney & Dalby,* for appellant.—On question that the chief State's witness could not testify that he told another of the transaction at a certain time and place: Kirksey v. State, 58 Texas Crim. Rep., 188; Riojas v. State, 36 id., 182; Pride v. State, 52 id., 441; McKnight v. State, 50 id., 252; Sanders v. State, 31 id., 525; Gardner v. State, 55 Texas Crim. Rep., 394, 400, 117 S. W. Rep., 140, 148.

On question of certain parties inquiring for stolen cattle and other transactions: Streight v. State, 62 Texas Crim. Rep., 453, 138 S. W. Rep., 742.

On question of refusing introduction of judgment of conviction showing moral turpitude: Lee v. State, 45 Texas Crim. Rep., 51; Brazos v. State, 33 S. W. Rep., 540.

On question of insufficiency of the evidence: Franklin v. State, 53 Texas Crim. Rep., 388; Maibaum v. State, 59 id., 386; Denson v. State, 47 id., 439; Franklin v. State, 62 id., 433; Jones v. State, 59 id., 559; Vails v. State, 59 id., 340; House v. State, 15 Texas Crim. App., 522.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—Appellant was convicted of cattle theft and his punishment assessed at three years in the penitentiary.

The State had Otto Russell, who was a guilty participant in the crime, to testify as one of its main witnesses. He had a family who resided in said county a few miles from Red River. He stayed most of his time for months previous to the alleged theft at an old abandoned ferry named Bee Tree Ferry. While he did work in ditching and draining near said old ferry, a part of his business at least was bootlegging—unlawfully selling intoxicating liquor.

Russell testified that on Saturday evening, September 9, 1916, about the middle of the evening appellant came to where he was at said ferry and talked with him about the liquor business and proposed a partnership with him in that business. He was corroborated in this by another witness, Mr. Burkham. He swore that on this occasion appellant made an engagement with him to meet him at a certain place some five or six miles distant late that evening to arrange a partnership with him. From the State's standpoint appellant made this engagement with him so as to get him away from said old ferry so that he and his

two associates, Brawley and Fisher, in the theft, as he claimed, could steal and drive the cattle across Red River into Oklahoma at said old ferry without his knowing anything about it.

Russell also swore that late that evening he started out to meet said engagement with appellant and that some distance on his way, not very far, he came upon appellant and his said two confederates   They were together in a pasture or pen on the river in the bottom, where they had from ten to fifteen head of cattle penned.  That appellant then told him that he had to assist them in putting said cattle across the river about night; that he would give him $10 to keep his mouth shut, and if he didn't they would put him at the bottom of the river with a plow-beam and wire around him.  That he was thus forced by them to assist them in putting the cattle across the river.  That when he found these parties together on this occasion they were eating some canned goods.  He fixed the location of where they were at this time just inside of the fence where they had the cattle penned.  He was corroborated by witnesses as to the eating of the canned goods at the said location, who testified that they found at this location the cans, which showed to have been freshly opened and the contents eaten.

Russell further testified that they inquired of him where they could get something more to eat.  He informed them that there was a negro by the name of Brown who lived not far distant from where they were then who would supply them with supper if they would apply to him. He was corroborated in this by appellant himself, who swore that he thereupon went to the negro Brown's, ordered the supper and that Brown about sundown brought supper to them where they had eaten the canned goods, and that they ate that supper there.  The State sought to introduce Brown as a witness, but it turned out that he was an ex-convict, and while he claimed to have had a pardon, he could not find it, and thereupon on appellant's objection Brown's testimony was excluded.

Russell further swore that after they had eaten supper they made him and Brown assist them in driving the cattle into the river at said old ferry, requiring him and Brown to station themselves in the chute made into the bank of the river for the drive down it to the water made for said old ferry; that the bank of this chute on one side was very steep, from ten to fifteen feet high, so that the cattle could not go up it; that appellant and his two confederates then drove the cattle along the bank of the river from where they had them penned on a bench down to this old ferry chute; that all the parties provided themselves with good large sticks with which they beat and forced the cattle into the river.  The cattle were very much averse to taking the river. Several other witnesses corroborated Russell in that they found at and about this old ferry the said sticks and that they had hair on them. In addition, he was corroborated by several others, wherein they testified that they found the tracks of these cattle where they had been so penned and where they were driven therefrom down to this ferry

and forced into the river. Russell also swore that when they were thus handling the cattle he recognized certain of them, especially some three head, which he described and told to whom they belonged, the three at least to different persons named by him.

The State introduced another witness who testified that late said evening he was passing along this river bottom and along near night heard persons halloaing, which he took to be persons handling rough stock, cattle, and which he took to be people driving cattle of some kind. That some twenty or thirty minutes later he saw appellant apparently coming from towards where he had heard said holloaing and that he saw appellant ride up to some man in a field, apparently having some conversation with him, and then leaving going back. Evidently this was the negro Brown, whom appellant himself swore he saw about this time and ordered supper for the crowd from him.

By different witnesses, and by even appellant himself, it was proven that appellant and his said two confederates, Brawley and Fisher, were at Russell's and near about there late during said evening, and appellant himself swore that he was with them at the location fixed by Russell where they ate the supper he ordered and Brown brought to them. He claimed, however, that they were there drinking and playing cards and he denied any and everything about the cattle.

The State proved by another disinterested witness that he saw appellant with Fisher and Brawley at a certain gin late Friday evening and that when Brawley and Fisher rode up appellant went out to where they were, leaned up on the horse of one of them and had a private conversation with them for some time. That he again saw these three parties, it seems, at a store about said gin, the next morning. Appellant himself swore that these parties were at his house some time Saturday, the day of the theft. This evidently was Saturday evening before they rounded up and penned said cattle.

Russell further swore that he and Brown remained with Pope, Brawley and Fisher nearly all night at the place where they had eaten, and that they all were drinking and carousing that night after they had put the cattle into the river. That the appellant got pretty drunk and slept part of the time. Some of the others may also have slept some. That after they had put the cattle into the river and some of them crossed, it was arranged between Pope, Brawley and Fisher that Brawley and Fisher would cross the river next day into Oklahoma, where some of the cattle had landed, get and take them to a certain town in Oklahoma or another in Arkansas or to both said towns and dispose of them. It was unquestionably shown that Brawley and Fisher lived in Oklahoma.

Russell further swore that appellant next morning, Sunday, before day, got up and went to his home, some six or seven miles in Bowie County distant from the river. He was corroborated in this by appellant himself, who swore that he did get up at the time and went to his home. He was also corroborated in this by some other disinterested

witnesses, who swore that they saw appellant as he was going to his home on this occasion and that he was riding very fast and that he must have reached his home before or about sunup.

Russell also swore that the next day, Sunday, he saw across the river on the Oklahoma side from said ferry the said three head of cattle which he had recognized and identified the night before when they were putting the cattle into the river. He was corroborated in this by the testimony of other disinterested witnesses, one of whom testified that he saw and he thought he recognized these three head from where he was at said old ferry to where these cattle were across the river on the Oklahoma side. Another witness testified that he and two others saw these cattle on this occasion and went across the river to the Oklahoma side and there saw and thoroughly identified them and drove these cattle back across the river to the Texas side. That when they were crossing the river they saw Brawley and Fisher and some one or two other persons near where these three head of cattle were. That at first they were on the ground off of their horses, but when he approached nearer Brawley and Fisher got on their horses and hastily rode away. That after getting some distance from where the cattle were, they stopped, and when they saw them drive these three head back across the river, they came back to where this witness was, and as he was crossing in a skiff going back to the Texas side, they got in the same skiff and also went back to the Texas side. That he had no conversation with them, and they said nothing to him. They were evidently watching to see what they could find out or whether or not they and appellant had been detected in the theft. They were evidently near these cattle at the time they were discovered on the Oklahoma side for the purpose and with the intent of driving them away to one or the other of said towns in Oklahoma or Arkansas and disposing of them.

The other testimony in addition to Russell's without doubt showed that the said three head of cattle were thoroughly identified as the property of three separate and distinct owners who lived on the Texas side and that was where they were raised and ranged, on or near the river. The one head alleged as stolen from Mr. Vineyard was shown to have been one of the three head forced to cross the river to the Oklahoma side by appellant and his confederates Saturday about night and that it was taken from the owner without his knowledge or consent, etc.

There were other items of testimony by said Russell, wherein he was corroborated by others, all tending to show appellant's proximity and connection with Brawley and Fisher in the taking and stealing of said cattle.

The court told the jury that said Russell was an accomplice and that he had to be corroborated as required by our statute. The statute (art. 801, C. C. P.) prescribes that a conviction can not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed. It is well

established that an accomplice witness can be corroborated by either circumstantial or positive testimony or both and that when the testimony of the accomplice shows the guilt of an accused the corroboration is sufficient if it tends to connect the accused with the offense committed. (1 Branch's Ann. P. C., sec. 710, where a large number of cases are cited.) And that the corroborating testimony need not be sufficient to establish the guilt of the defendant, for if this was the case the testimony of an accomplice would be of no value. (1 Branch's Ann. P. C., sec. 719, where he collates a large number of decisions.) The testimony of the accomplice Russell in this case clearly was sufficient to show appellant's guilt, and he was amply corroborated so as to show appellant's guilty connection with the theft.

After the State's direct examination of said Russell and after he had testified fully as to appellant, Brawley and Fisher's taking and handling and putting said cattle across the river, he was asked by the district attorney: "When did you first tell anyone about this?" to which question appellant objected, because his answer would be hearsay and it was an effort to bolster up the testimony of this witness. The bill shows that appellant was not present at the time. The court overruled his objection and permitted the witness to testify: "It was on Thursday afterwards that I told it. I told it to Mr. B. H. Williams at that time because they had talked to me, and I knew they knew it." This question and answer was proper and legitimate on two grounds: (1) That he had first told about this transaction on Thursday following was a fact. Neither the question nor answer comes within the well established rule which forbids the State to bolster up a witness by proving by him or any other that on a certain occasion after the occurrence he told or swore to the same thing that he is testifying to on the trial. That rule does not apply either to said question or answer. The witness was not asked, and did not answer, whether or not he had told the same tale then that he then testified to, but was merely asked the sole question of when he first told of the occurrence. (2) Even if it could be construed that the witness on the stand testified that he had on a previous occasion told the same tale as he now testified to for the purpose of corroborating his present testimony, it would have been admissible under the circumstances of this case. While it was premature on the direct examination by the State, it afterwards became admissible, because appellant attacked the witness as testifying falsely from a corrupt motive and as manufacturing his whole testimony and sought to impeach him by proving that he had formerly been convicted of a misdemeanor, theft, involving moral turpitude. When this is the case, the witness can be corroborated by testifying himself or proving by another that on a previous occasion shortly after the transaction and before any motive or inducement existed to fabricate, he made statements of the matter similar to his testimony told on the trial. This is so well established that the authorities need not be cited, but see 1 Branch's Ann. P. C., sec. 181, where a large number of

cases are collated. So that, at most, if the question and answer could be construed to come within this rule, although it was premature, it was not reversible error on that account. The law is as stated by Mr. Branch: "On appeal the court will look at the real competency of the testimony adduced, and not to the order of its reception, and when found competent the judgment will not be reversed because of the time or order of its introduction." Moore v. State, 7 Texas Crim. App., 14; Cox v. State, 8 Texas Crim. App., 254; Hartsfield v. State, 29 S. W. Rep., 777; Knight v. State, 144 S. W. Rep., 967.

Neither did the court err in permitting the State to ask said witness if he voluntarily went into this thing—that is, participated in driving the cattle with defendant and others into and across the river, nor in his answer thereto,—"Well, I do not know that I went into this cattle theft voluntarily. When I came upon them they told me what they wanted me to do, and I did not feel like I wanted to resist. I was afraid of them." A witness is entitled to explain any fact tending to create a distrust of his integrity or truthfulness and to testify to what might have a tendency to show that he was less to blame in the commission of the crime than if he had himself originated it and its commission. (1 Branch's Ann. P. C., p. 60.)

Appellant's bill No. 3 complains that the district attorney asked the State's witness Williams: "Did you find the names of anybody over there who had seen anybody inquiring for cattle?" To which he objected because it was hearsay, immaterial and prejudicial. The witness answered: "Yes, the names of those people were Mr. Baldwin and his son and another man by the name of Jones. These parties live across the river in Oklahoma." The bill does not disclose how or in what way this matter was or could have been injurious to appellant. If it was immaterial, it in no way affected appellant injuriously and is of such a nature as would not cause or justify a reversal.

His next bill complains that the district attorney stated to the court when his witness Joe Calvit was on the stand that he could prove by him that he had had cattle stolen from him in the same community where the theft in this case had been committed and about the same time. Evidently this statement was by the district attorney to the court so as to inform the court what he was seeking to prove by the witness to which appellant was objecting. The bill does not show, and it seems as a matter of fact that the witness did not testify, to what the district attorney sought to elicit by this question.

On cross-examination said accomplice, Russell, upon being asked by appellant, testified: "Yes, I was charged with theft and plead guilty of stealing cross ties from Mr. Brewer. That has been four or five years ago; I would have rather paid a fine than be messed up in court. I gave the money to another man and asked him to pay it off. Yes, I was charged with stealing cross ties." Thereupon, upon cross-examination on this point at the instance of the State he testified in sub-

stance that while he was hauling ties for Mr. Clark he got some of Mr. Brewer's ties through mistake and that he did not really steal the ties, that he thought when he was paying the $25 fine he was really paying for the ties; that he was not put in jail nor arrested for it. The authorities are uniform and numerous to the effect that when a witness has been impeached as this one was by showing that he was convicted of a misdemeanor involving moral turpitude, he always has the right to show such explanatory circumstances in connection with the conviction inquired about as would remove the implication of untruthfulness and serve to reinstate him as a truthful witness; in other words, while he can thus be impeached, he can explain the circumstances and show that, while he was really convicted or plead guilty, in fact he was not guilty; and that was all that was done in this instance. So that the court did not err in excluding the judgment of conviction afterwards sought to be introduced by the appellant to the effect that he had plead guilty to the theft of said ties and was fined $10, the State objecting to the introduction of such judgment because it was not a legal judgment. The judgment shows that he was convicted and fined $10 and all costs for the theft of said ties. The law prescribes that in a conviction for petty theft both imprisonment in the jail and fine shall be imposed, or such imprisonment without fine shall be imposed. (Art. 1341, P. C.) The action of the court in excluding said judgment under such circumstances presents no reversible error.

Appellant filed several objections to the court's charge, all in one paper. No separate bill was taken to any particular charge of the court. The court's charge in connection even with the objections thereto made in the manner stated have been considered, and none of them show any reversible error.

His special charge with peremptory instructions to acquit should not have been given. Neither should his charge authorizing appellant's conviction of wilfully driving cattle from their accustomed range have been given. He could not have been convicted of that offense under the indictment herein, charging simply that he and said two persons, Brawley and Fisher, stole said head of cattle. Neither should his charge to the effect that if he wilfully took the one head of cattle described in the indictment and drove it from its accustomed range without the consent of its owner, but they do not find from the evidence beyond a reasonable doubt that he intended to appropriate it to his use and benefit and with the intent to deprive the owner of the value of it, then to acquit him. The evidence in this case did not raise any such issue which was required to be submitted by the court to the jury for a finding. The evidence showed theft of the animal by appellant, Brawley and Fisher.

After a careful consideration of the whole record and all of appellant's assigned errors, the record shows that appellant had a fair and impartial trial with the evidence amply sufficient to sustain his con-

viction and that no such error was committed, if any at all, as would authorize or justify the reversal of this case.

The judgment is, therefore, affirmed.

*Affirmed.*