Edith REYNOLDS, Appellant,

v.

The STATE of Texas, Appellee.

No. 44841.

Court of Criminal Appeals of Texas.

May 3, 1972.

Rehearing Denied Nov. 8, 1972.

Second Rehearing Denied Feb. 21, 1973.

Arturo C. Gonzales, Del Rio, for appellant.

John F. Pettit, Dist. Atty., Brackettville, and Jim D. Vollers, State's Atty., and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This appeal is taken from a conviction for the offense of murder. The punishment was assessed by the jury at life imprisonment.

Appellant challenges the sufficiency of the evidence to support the conviction. She argues that the state's case is based upon the testimony of an accomplice witness whose testimony is not corroborated.

On December 9, 1969, Joe Sandoval, an employee of the Texas Highway Department, was mowing grass beside Farm Road 693, at a point approximately two miles southwest of Brackettville, when he discovered the body of a deceased adult male. The body had decomposed to the extent that an identification was not made, and no identification papers were found near the body.

Local law enforcement authorities were immediately notified, and the body was removed to Del Rio, where an autopsy was conducted. Jack Mercer, a fingerprint expert with the Department of Public Safety, was also contacted. Mercer took fingerprints and sent one copy to the Federal Bureau of Investigation in Washington, D.C. These fingerprints established the identity of the deceased as James R. Reynolds, the husband of appellant.

Dr. Ruben C. Santos, the Chief Bexar County Medical Examiner, performed an autopsy on the body of James R. Reynolds on December 11, 1969. The autopsy report signed by Dr. Santos and introduced into evidence, relates that death resulted from ". . . multiple head injuries (blows caused by blunt instrument with force) with multiple depressed fractures of the skull, brain injury and throat injury, probably due to manual strangulation." Dr. Santos also concluded in his report that the death "more likely occurred about the 4th or 5th day of December, 1969."

The deceased was a sergeant in the United States Air Force. On November 26, 1969, he had been scheduled to board a plane at Laughlin Air Force Base for his new duty station in Vietnam. He had missed this flight, and the Air Force had immediately notified the Del Rio Police Department that he was missing. Included in the missing persons report was a description of Sergeant Reynolds' automobile, a blue 1968 Chevrolet Impala bearing Texas license number HRN 264.

On that same day, Officer Tom Birtrong, of the Del Rio Police Department, received a call from his dispatcher that a vehicle was presumed abandoned under the San Felipe Creek Bridge on Highway 277. Officer Birtrong investigated the report and found a blue 1968 Chevrolet stuck in the mud under the bridge. He ran a check on the registration of such vehicle and found that it was registered in appellant's name.

On the night of December 9, 1969, a meeting was held at the office of Texas Ranger Grady Sessums in Del Rio to discuss the investigation. In attendance at that meeting were Ranger Sessums, Ranger Sergeant John Woods, and Kinney County Sheriff J. A. Sheedy. The meeting was held prior to the identification of the body, and it was learned at that time that a watch and two rings which had been taken from the body might possibly belong to the deceased. This tentative identification of

these items coupled with the Air Force missing persons report led Ranger Sessums to call on appellant.

Appellant was at this time in the hospital at Laughlin Air Force Base, where she had been admitted for an apparent overdose of pills in an attempt to commit suicide.[1] Ranger Sessums located appellant in the hospital, and on December 10, 1969, went there to talk with her. At the time of this first discussion with appellant, she was under no suspicion. She identified the watch and rings as being of the type owned by her husband. She was asked if she would give her permission for the officers to check her residence, a mobile trailer, to obtain fingerprints of her husband so that they could be checked with the prints taken from the body. Permission was given, and officers retrieved shaving lotion bottles and a hair oil bottle from the bathroom cabinet for the purpose of fingerprint tests and comparisons.

■ On December 11, 1969, Sessums again visited appellant at the hospital. She was told that her husband's body had been identified. She was also given her "statutory warning" at this time.[2] After having been warned of her rights, she was asked if she would consent to another search of the trailer for more clues. Once again appellant consented to the search of her trailerhouse. She also consented to a search of her automobile.

On December 12, 1969, appellant's daughter, Linda Beryl Smith, came to the Department of Public Safety Office and volunteered information concerning the

death of her step-father.[3] In her written statement she accused appellant of having murdered the deceased.

A search of appellant's trailer was conducted on December 13, 1969. Numerous items were seized, including whiskey bottles, a bedside table, a steel hammer, a bone fragment, and blood and hair specimens from a bedsheet, the walls, the ceiling, and the floor. The automobile[4] was searched, and more blood stains were discovered. Samples of these blood stains were forwarded to the Department of Public Safety laboratory. Analysis of these stains revealed that these were blood type A, which matched the blood type of the deceased.

On August 3, 1970, prior to appellant's trial, Linda Beryl Smith was granted immunity. She testified at appellant's trial and was declared by the court, in the charge to the jury, to be an accomplice witness as a matter of law.

Linda Beryl Smith's testimony reveals that she was living with appellant and the deceased on November 25, 1969. At 10:30 P.M. on that evening, she returned home from a date and saw the deceased asleep in his bedroom and appellant lying on the couch in the living room. She talked with appellant who told her that she "had somebody flying in to get rid of J. R.[5] . . . get rid of him." The alleged killer, a man named Monte Goode, was flying in that night and was scheduled to arrive in Del Rio at 2:00 A.M. The witness testified that she was not surprised by these statements by her mother, since appellant

1. Thomas Rose, who was present during the attempt and who had taken appellant to the hospital, testified that appellant told him she was attempting to commit suicide because her daughter had given her baby away. The suicide attempt occurred on December 6, 1969.

2. A warning is not required prior to a request for consent to search. However, the giving of the warning in such circumstances is good police practice. Cf. DeVoyle v. State, Tex.Cr.App., 471 S.W. 2d 77.

3. Sessums had talked with Linda Beryl Smith earlier that same afternoon. At that time she had told him that the last time she had seen the deceased was at approximately 10:30 P.M. on the night of November 25. Later that same evening, she contacted Sessums and made the above mentioned statement.

4. The record reflects that this automobile was the same as the one found stuck in the mud on November 26.

5. The deceased was known as "J.R."

had been making statements like that for about four years and since she was always talking about getting rid of her husband when she was "drinking real heavily." Appellant having been drinking heavily that evening, the daughter "half-way believed her and half-way didn't."

At approximately 2:30 A.M. on November 26, 1969, Witness Smith was awakened upon hearing the deceased make a "coughing, gagging, and a choking sound." When she got out of bed to ascertain what was wrong, appellant told her to get back in her room. A few minutes later she again saw appellant, who appeared to be sober and "real scared." She heard the back door of the trailerhouse open and, looking out a window, observed appellant, dressed in an orange plaid coat and pajamas, and a man, who she could not clearly see, place a blanket-covered body in the trunk of the family car. The pair returned to the trailer for a brief period and then left again, driving away in the car. The witness stated that, as soon as the couple had departed, she went into the deceased's bedroom. There she found a trail of blood leading from the bed to the bathroom and a puddle of blood in the bathtub. The deceased was nowhere to be seen, the telephone in the deceased's bedroom was gone, and the blanket on his bed was missing. She then returned to her room and went back to sleep.

At approximately 6:00 A.M., the witness was again awakened, this time by the appellant's return. The pants of appellant's pajamas were wet, and she had crawled into bed with her daughter in an attempt to go to sleep. Witness Smith asked her if she had drowned the deceased, and appellant's response was that she had killed him with a hammer. Upon being asked where they had placed the body, the response was "that they had dumped him on the side of the road," the road in question being the

one from Brackettville to Eagle Pass. Further questioning elicited the statement from appellant that she had killed her husband for the insurance money and that Monte Goode was to get $10,000.00 for his part in the crime. The car had been abandoned when ". . . it bogged down because she was washing the trunk of the car out, and she said she threw the blanket in the creek, and the hammer, and the telephone she threw it out in the weeds beside the creek . . . ."[6] The witness was warned not to mention the incident to anyone.

Mother and daughter then proceeded to clean the apartment. Appellant changed the sheets on the deceased's bed and sprayed the bedside table with silver spray paint to cover blood stains. Linda Beryl Smith scrubbed the bathroom to remove blood stains and disposed of appellant's keys. She testified that these actions were performed in order to conceal the crime and aid her mother. She also took the orange plaid coat, which her mother had worn, to the cleaners.[7] She left instructions to remove the bloodstains on the coat and placed it in her mother's name. The coat in question belonged to the daughter (Linda Beryl Smith).

Witness Smith further testified that she did not tell the story of the murder before she did because she wanted to help her mother and because she feared that, if she told it, Goode would return and kill her. She admitted that she had been granted immunity from prosecution. She stated that she had previously told June Slaven about the incident and that she and Slaven had driven out to the country on December 6, to look for the body. They did not find it. She further testified that she did not realize that she was the secondary beneficiary of the deceased's insurance policy until after she had given the statement incriminating her mother.

6. These items were apparently never recovered. The hammer introduced by the state was seized at the trailer and never connected to the crime.

7. The coat was taken to the cleaners on December 9, 1969.

June Slaven testified that she operated the Fisherman's Lounge in Del Rio and that appellant had worked for her on occasion prior to November 26, 1969. She stated that during the summer of 1969, appellant "was drunk in the bar one night and she was kinda agitating a fight, and so I picked her up and took her out to the house." She stated that appellant had told her that night that she was going to get rid of her husband. Appellant told Slaven that she would "split the insurance" with her if she would help kill the deceased. The witness also testified that Linda Beryl Smith had told her about the way in which deceased had met his death and that they had made an unsuccessful attempt to find the body.

On cross-examination, she admitted that she had previously told another lawyer that she did not know anything about the case. She also testified that she had attempted to adopt appellant's grandchild, the illegitimate child of Linda Beryl Smith, but that appellant objected to her taking custody of the child after its birth.[8]

Jesse Mendez testified that he met appellant in 1967 and that, during the spring of 1968, appellant had offered him $10,000.00 to "get rid of her old man." The payment was to come out of her insurance money. He stated that thereafter she inquired of him "a number of times" whether or not he was going to do this job for her. According to Mendez, appellant appeared to be serious about the proposition. Mendez had dated appellant and was unhappy when she refused to see him any longer.

As heretofore stated, the court charged the jury that Linda Beryl Smith was an accomplice witness as a matter of law. We agree that such charge was proper.

A witness who is an accessory to the person accused is an accomplice witness. e. g. Williams v. State, Tex.Cr.App., 464 S.W.2d 842; Jones v. State, 160 Tex. Cr.R. 479, 272 S.W.2d 368; Howard v. State, 92 Tex.Cr.R. 221, 242 S.W. 739. The fact that a witness, because of his or her relationship to the accused, cannot be prosecuted as such under Article 78, Vernon's Ann.P.C.,[9] does *not affect his status as an accomplice witness.* Gonzales v. State, Tex.Cr.App., 441 S.W.2d 539, at fn. 1; Jones v. State, supra; Turner v. State,

8. In order to understand the background of this case, it is necessary to understand the relationship between the various parties. The record reflects that Linda Beryl Smith had been "going steady" with a young Air Force officer who refused to discuss marriage until the child was out of the picture. Linda was therefore quite anxious to give the child to June Slaven. Appellant wanted her and deceased to adopt the baby. The deceased had agreed to this plan. While Linda had agreed to wait to make a decision on this matter until it could be determined whether appellant and deceased could deal with their marital problems, nothing had been resolved by the time deceased was to leave for Vietnam. Slaven was angry with appellant for attempting to block the adoption; Linda Beryl Smith intensely disliked both the deceased and appellant. Linda blamed appellant for the dissolution of the marriage with Linda's father, and was attempting to get her mother to re-marry her father. She viewed the deceased as an obstacle to this plan. The deceased was upset at Linda for attempting to destroy his marriage. During the period immediately preceding his death, deceased had agreed to give appellant a divorce. This matter, however, does not seem to have been pursued; and according to Linda Beryl Smith, the relations between him and appellant had improved just prior to his death. Thus, at the time of the scheduled departure of the deceased, no resolution had been made of either the marital problems or the child custody. On December 5, 1969, Linda Beryl Smith placed her child in the custody of June Slaven. On December 6, 1969, appellant and her daughter had argued about this; and appellant attempted suicide.

9. This statute provides: "The following cannot be accessories: The husband or wife of the offender, his brothers and sisters, his relations in the ascending or descending line by consanguinity or affinity, or his domestic servants." See also Morrison & Blackburn, The Law of Principals, Accomplices & Accessories, 1 V.A.P.C. XIII.

117 Tex.Cr.R. 434, 37 S.W.2d 747. Where, as in the instant case, a witness has *voluntarily aided the accused* in concealing the crime, he is an accomplice witness; and his testimony must be corroborated.[10] e. g. Jones v. State, supra; Turner v. State, supra; Howard v. State, supra.

The test for determining the sufficiency of such corroboration is to eliminate the evidence of the accomplice from consideration and then ascertain whether there is other evidence of an incriminating nature which tends to connect the accused with the commission of the offense. e. g. Colunga v. State, Tex.Cr.App., 481 S. W.2d 866 (1972); Cherb v. State, Tex.Cr. App., 472 S.W.2d 273; Thomas v. State, 166 Tex.Cr.R. 331, 313 S.W.2d 311; Welden v. State, 10 Tex.App. 400. The mere showing that an offense occurred is not sufficient corroboration. Colunga v. State, supra; Odom v. State, Tex.Cr.App., 438 S.W.2d 912; Edwards v. State, Tex. Cr.App., 427 S.W.2d 629. Thus, evidence which verifies extraneous matters without tending to connect the accused to the crime is insufficient.

The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish his guilt. Otherwise, the testimony of the accomplice would be valueless. The corroborative evidence is sufficient if it tends to connect the accused with the crime, and it is the cumulative weight of such evidence which supplies the test. e. g. Colunga v. State, supra; Cherb v. State, supra; Rogers v. State, Tex.Cr.App., 461 S.W.2d 399; Dalrymple v. State, Tex.Cr.App. 366 S.W.2d 576; Hill v. State, 134 Tex.Cr.R. 163, 114 S.W.2d 1180; Banks v. State, 107

Tex.Cr.R. 221, 296 S.W. 563; Cooper v. State, 77 Tex.Cr.R. 209, 177 S.W. 975.

In the instant case the corroborative evidence shows: (1) that the body of appellant's husband was found on December 9, 1969; (2) that the body was found beside a farm road which connects Brackettville with Del Rio; (3) that the cause of death was either manual strangulation or head wounds inflicted by a severe beating with a blunt instrument; (4) that death occurred on or about December 5, 1969;[11] (5) that deceased had type A blood; (6) that type A blood stains were found in appellant's home and in the trunk of the family car; (7) that, in the spring of 1968 and in the summer of 1969, appellant had, while intoxicated, stated that she desired to kill her husband and had asked June Slaven and Jesse Mendez for their assistance in carrying out this plan; (8) that the deceased was heavily insured; (9) that the family car was discovered stuck in the mud beside San Felipe Creek; and (10) that, prior to going to the police, the accomplice witness had made a prior consistent statement to a friend concerning the death of her step-father.

The prior consistent statement made by Linda Beryl Smith to June Slaven cannot be considered in determining the sufficiency of the evidence. Such a statement is hearsay and is therefore without probative value, even if admitted without objection. Cherb v. State, supra. Moreover, this statement was made by the accomplice witness, and Article 38.14, supra, requires that accomplice testimony be corroborated by other evidence.

The remaining corroborative evidence shows the commission of the crime,

---

10. Article 38.14, Vernon's Ann.C.C.P., provides:
"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

11. It should be noted that there are two possible dates of death in the instant case. The autopsy report concludes that death most likely occurred on the 4th or 5th of December. The accomplice witness testified that death occurred in the early morning hours of November 26, approximately nine days earlier.

a possible motive for appellant to have committed the crime, and prior threats by the appellant to commit such crime. Apart from the testimony of the accomplice witness, Linda Beryl Smith, there is no evidence which demonstrates that the deceased met his death on November 26. The autopsy report places the date of death as being approximately nine days later. Omitting the testimony of the accomplice, there is no evidence which shows that appellant did anything in connection with the crime except make drunken threats approximately six months and a year and a half earlier.

Despite the thorough investigation which was conducted in this case, the evidence is insufficient to corroborate the testimony of the accomplice witness.

The judgment is reversed and the cause remanded.

## ON APPLICATION FOR REHEARING

Rehearing denied.

DOUGLAS, Judge (dissenting on State's motion for rehearing).

In the recent case of Brown v. State, 475 S.W.2d 938, this Court held the evidence sufficient to support the conviction upon circumstantial evidence, where no accomplice witness testified. Excluding the accomplice testimony in the present case, the evidence is, in my opinion, much stronger than in the Brown case, supra.

In that case, Dolphus Jack Brown, the defendant, lived in the same house near Shallowater with his parents. The brutally beaten bodies of his parents were found in the home. Appellant's brown shirt with two tiny blood spots on it was found in a clothes hamper near the bedroom where the bodies were found. In a trash receptacle in a State park near Lubbock, an employee found a bedspread, bloody clothes, a pair of trousers, towels and wet bloody washcloths. A credit card and a cigarette lighter belonging to the deceased father, D. J. Brown, were also found. Among the items was a wet bloody towel bearing the first initial of the defendant's last name and the last four digits of his army serial number. Blood found on the trousers that Dolphus Brown wore the day before the bodies were found contained the same type as that of his mother. No motive was shown, except that Dolphus Brown owed a small amount of money, and he perhaps wanted money for a poker game. There was some uneaten food on the table of the home when the bodies were found which indicated that their killer was known to them. There was evidence that Dolphus Brown had been at the home the afternoon before the bodies were found. The defendant had somewhere between $55 and a $100 when he entered a poker game that night. This evidence was held sufficient, by a unanimous court, to support the conviction.

In the present case, Edith Reynolds and her daughter, Linda Smith, lived with James Reynolds, the deceased, in a trailer home. The officers found there had been foul play in the bedroom of the trailer home. Type A human blood, the same as that of Reynolds, was found. Human hair and blood were found on the ceiling. A table which contained Type A blood spots on it had been repainted. Human bone fragments were found in the bedroom.

An automobile registered in the name of Edith Reynolds was found some distance from the trailer home stuck in mud by a creek. The automobile jack in the trunk of the car contained Type A human blood. Apparently there had been an attempt to remove this blood. Hair was found on the rear bumper of the car. This was not positively identified as James Reynolds' hair but was similar to it.

Bone fragments found embedded in the brain of the deceased were similar to those found in the bedroom of the trailer.

Edith Reynolds asked June Slaven to help her drown James Reynolds and stated

that he could not swim and that they could get him in a boat and then into the water.

Jesse Mendez testified that Edith Reynolds asked him several times if he wanted to make $10,000 by killing her husband. She stated that she wanted to collect his life insurance. It was shown that Edith Reynolds was the primary beneficiary in the policies.

After the homicide, Edith Reynolds attempted suicide. From this the jury could, and possibly did, draw the conclusion that this was a circumstance showing guilt.

In the present case the motive was proved by two non-accomplice witnesses, June Slaven and Jesse Mendez. She wanted her husband dead and wanted the insurance money. Blood of the type of the deceased was found in the trailer home. Fragments of bones were found in the bedroom. Attempts had been made to remove the blood spots. The same type of blood was found in Edith Reynolds' car as was found in her bedroom and upon her repainted table. The same type of bone fragments were found embedded in the brain of the deceased as those found in the bedroom.

In the Brown case, supra, the opinion correctly stated:

"In Jones v. State, [442 S.W.2d 698, 702] supra, this court stated:

" 'It is not necessary that every fact point independently and directly to the guilt of a defendant. It is enough if the conclusion of guilt is warranted by combined and cumulative force of all incriminating circumstances. Parish v. State, 85 Tex.Cr.R. 75, 209 S.W. 678; Finch v. State, 89 Tex.Cr.R. 363, 232 S.W.2d 528.'

"Further, in Taylor v. State, 87 Tex. Cr.R. 330, 221 S.W. 611 at 615, it was stated:

" 'The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. Shultz v. State, 13 Tex. 401; Hamlin v. State, 39 Tex.Cr.R. [579] 606, 47 S.W. 656; Porch v. State, 50 Tex.Cr.R. 335, 99 S. W. 102.' "

Under the above test recently approved by this Court and without considering the accomplice testimony, it appears that the circumstantial evidence is much stronger than in the Brown case and is sufficient to support the conviction.

However, as pointed out in the original opinion there is more than circumstantial evidence. We have the evidence of the daughter of the appellant, Linda Smith. She testified that Edith Reynolds had stated on several occasions that she wanted to kill the deceased. Even after he had agreed to let her get a divorce.

Linda Smith testified that she heard loud noises in the trailer house the night of the homicide. She then saw the appellant and the back of a man whom she was unable to recognize load the deceased in the trunk of appellant's car and then leave.

Without discussing all of the incriminating evidence at this time, it, in my opinion, corroborates the accomplice witness Linda Smith and is sufficient to support the conviction. It is much stronger than the corroborating evidence in the very recent case of Runkle v. State, Tex.Cr.App., 484 S.W. 2d 912. In that case the body of James Key was seen by a railroad brakeman at approximately 9:30 p. m. near a railroad track some seven miles from Spofford. The body was not there some five hours earlier. Apparently the body which was wrapped in a plastic material had been thrown from a passing train. Nearby, officers found a broken pair of eyeglasses and a bloody wine bottle. Also near the body bloody paper and other bloody items

were found. Officers found some letters addressed to a James A. Key.

Officers stopped and searched a west bound train at 3:30 a. m. the next morning in Del Rio. In a boxcar they found Runkle, the defendant, and James Franks and arrested them. Two men in another boxcar were arrested but were later released. They also found a receipt bearing Runkle's name, a pocket knife, a piece of blood-stained cardboard, pieces of a broken wine bottle and other items. Human blood spots were found in the boxcar after it was left at Valentine. The blood was not typed. Human blood was found on a rope around the neck of the body of Key.

Franks was indicted with Runkle. His case was dismissed and he was called as a witness for the State. He testified that he, Runkle and Key boarded the boxcar in San Antonio after all three of them had been drinking wine heavily. Franks went to sleep but was later awakened by a fight between Runkle and Key. Franks then held Key while Runkle put a rope around Key's neck and began to choke him. Franks testified that he went to sleep again, and when he awoke he was informed that Key was dead. When the train stopped, Franks helped Runkle wrap the body in plastic material and then place it by the tracks. The two then threw various items off the train.

The trial court instructed the jury that Franks was an accomplice witness and his testimony had to be corroborated.

On appeal, this Court, in a majority opinion, held that the testimony of Franks was sufficiently corroborated.

Again, in the present case, it appears that the evidence to corroborate the accomplice witness Smith is much stronger than in Runkle's case.

Even though some of the facts in the present case have been set out in comparing the circumstances with the Dolphus Jack Brown case and even though it involves some of the same facts, the well prepared brief of the district attorney on the State's motion for rehearing is adopted as a part of this, the dissenting opinion:[1]

"This Honorable Court erred in reversing the judgment of the trial court in that there was in the Statement of Facts non-accomplice testimony tending to connect the accused with the offense.

"If the testimony of the accomplice is deleted from the record, the facts are developed from non-accomplice testimony as follows:

"1. The accused and the deceased were living together as husband and wife in a trailer house.

"2. There was obviously foul play in the bedroom of the house trailer in that human type A blood and human bone fragments were found there.

"3. The automobile registered in the name of the accused was found under suspicious circumstances stuck in the mud by a creek. There was blood on the automobile jack in the trunk of the car and it appeared that there had been an attempt to remove this blood, which was also human blood, type A.

"4. The accused made a suicide attempt but explained that she did this because her grandchild was going to be placed for adoption. We contend that this is another suspicious circumstance and that it should be viewed similarily to flight from the scene of a crime and is a circumstance tending to show guilt.

"5. The body of the deceased was found and it appeared that the deceased had been beaten to death with a blunt instrument. His blood was proven to be Type A and similar to the blood found in the trailer; and bone fragments were found imbedded in the brain similar to those found in the bedroom of the trailer.

1. References to page numbers in the record as well as formal parts are omitted.

"6. Prior threats on the life of the deceased by the accused were proven. These were shown to be efforts by the accused to hire someone, with the deceased's insurance proceeds, to kill the deceased.

"7. It was developed that the deceased had approximately $55,000.00 in life insurance and that the accused was the primary beneficiary of the policies.

"In the case of Nash v. State [61 Tex. Cr.R. 259], 134 S.W. 709 (Cr.Crim.App. 1911) the Court defined and discussed the word "tending" as follows on page 719:

"'To stretch, extend, direct one's course; to be directed as to any end, object or purpose, to aim; to have or give a leaning. Therefore, we would gather from this article that if the circumstances lean toward, or tend toward, the defendant as the party who committed the offense, and showed the truth of the prosecutrix, this would be all the law required.'

"In the Nash case, which was a seduction case in which the law required the corroboration of the testimony of the prosecuting female witness, the only corroborating evidence developed was that the prosecuting witness later gave birth to a child and that she had been seen in the company of the accused at social functions. This was held sufficient by the Court. The Nash case has been a part of the jurisprudence of Texas for sixty-one years. It has been cited many times by this Honorable Court and the Court's original holding in the case at bar is inconsistent with Nash in that the Court would seem to require every constituent element of the offense of murder as sworn to by the accomplice to be corroborated. Again referring to Nash (p. 719):

"'The writer of this opinion in the case of Williams v. State [59 Tex.Cr.R. 347], 128 S.W. [1120] 1121, uses this language: "It is insisted before this court that, because there was no evidence corroborating her upon this point,

the conviction cannot stand. We do not agree to this contention; all crimes have in them different issues and different elements that are required to be proven in order to sustain a conviction. The statute is general that the accomplice must be corroborated by other testimony, tending to connect the defendant with the commission of the offense. The statute does not say what this testimony shall consist of. If the testimony other than that of the accomplice should make out a complete offense, it would not be necessary to use the accomplice's testimony. Hence the law wisely provides that the corroboration must tend to connect the defendant with the commission of the offense, and to require that every constituent element of the offense, as sworn to by the accomplice, must be corroborated, would be requiring of the state an impossibility."'

To require every constituent element of the offense of murder to be corroborated is clearly not the law.

"This Honorable Court spoke further to this question in Rogers v. State ([122 Tex.Cr.R. 331] 54 S.W.2d 1010 Tex.Crim. App.1932). Judge Morrow gave the opinion. He stated as follows:

"'The law declares that there must be corroborating evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely show the commission of the offense. Article 718, C.C.P. 1925. This statute was in the first Code of Criminal Procedure adopted in this state, and since its adoption it has remained unchanged. (It remains the same today [see Art. 38.14 Vernon's Ann.C.C.P.]). Speaking of it in a recent case, the following language was used: "In the reports the word 'tend' has been defined 'to have a leaning' (Chandler v. State, 89 Tex.Cr.R. 597, 232 S.W. 318); 'serve, contribute or conduce in some degree or way', or 'have a more or less direct bearing or effect' (Boone v. State, 90 Tex.

Cr.R. 374, 235 S.W. 580, 584); 'to be directed as to any end, object, or purpose' (Nash v. State, 61 Tex.Cr.R. 259, 134 S. W. 709); and in Webster's Dictionary, the word 'tend' is thus defined: 'To be directed or have a tendency, conscious or unconscious, to any end, object or purpose'." Shrader v. State, (Tex.Cr.App. [121 Tex.Cr.R. 623] 51 S.W.2d 607, 609). See also, Minor v. State, 108 Tex.Cr.R. 1, 299 S.W. 422. The requirement of the statute may be met by circumstances as well as by direct evidence. See Nash v. State, 61 Tex.Cr.R. 259, 134 S.W. 709.'

"We think it is fair to state that the record is clear that the injuries to the deceased, James Reynolds took place in the trailer house in which the parties were living as husband and wife, in that the witness, Wayne Meritt, testified that there were bone fragments found in the bedroom of the trailer. Type A human blood was found on the walls of the bedroom. Type A human blood was found on a bedside table which had obviously been sprayed with paint to cover the blood stains. An additional bone fragment was found in the bedroom with Type A human blood on it. Further, type A human blood was found on the automobile jack in the trunk of the car of the parties and it appeared that the jack had been rubbed, obviously to remove the blood stains.

"We think it also fair to state that the similarity between the bone fragments found in the brain of the deceased by Dr. Santos and in the bedroom of the accused, and the fact that the deceased had type A human blood is corroborative of the fact that the deceased met his death at the place where he was living with the accused.

"We further contend that the witness Jesse Mendez established more than drunken threats on the part of the accused. She asked him if he wanted to make $10,000.00 for killing her husband to be paid from insurance proceeds. According to Mendez, she made this proposition to him more than six times and while sober. On cross-examination when Mendez was asked exactly what the accused had said to him with regard to how she felt about her husband, she said, 'I want to see the son-of-a-bitch dead.'

"The accused claims that outcry was made to the authorities about the disappearance of her husband. The outcry that was made does not reflect that she reported any blood being in her trailer on the walls, ceiling, bedside table or curtains, nor the bone fragments with the deceased's blood type on them that was found there, nor the blood found in the family car which was attempted to be removed from the jack.

"The jury which tried this case apparently did not feel that the attempted suicide of the accused was because she was despondent over her grand-daughter's being placed for adoption. That jury obviously viewed the suicide attempt as one generally views flight from a crime scene or other suspicious conduct of an accused.

"In the case of Cawley v. State ([166 Tex.Cr.R. 37] 310 S.W.2d 340 Tex.Crim App.1957), the opinion by the late Judge Woodley, it was held that:

"'An accomplice witness can be corroborated by circumstances. Pope v. State, 81 Tex.Cr.R. 54, 194 S.W. 590; Tyler v. State, 78 Tex.Cr.R. 279, 180 S. W. 687; Reed v. State, 118 Tex.Cr.R. 307, 40 S.W.2d 97; White v. State, 129 Tex.Cr.R. 59, 84 S.W.2d 465; Langford v. State, 121 Tex.Cr.R. 5, 50 S.W.2d 808. When unexplained, flight has long been deemed indicative of a consciousness of guilt. "The wicked flee when no man pursueth . . ." Proverbs 28:1. Evidence of flight is admissible where one is charged with an offense, on the ground, in substance, that is is some evidence of guilt, and amounts in effect to a quasi admission of guilt of the offense charged. Damron v. State, 58 Tex.Cr.R. 255, 125 S.W. 396. Escape, flight and attempts to escape are always admissible as evi-

dence of guilt. Wilderson [Wilkerson] v. State, 60 Tex.Cr.R. 388, 131 S.W. 1108, 1111.'

"Certainly as far as the jury was concerned the accomplice witness, Linda Beryl Smith was corroborated by the following circumstances:

"1. Gore and bone fragments in the bedroom of the trailer where the accused and the deceased were living together as husband and wife; and similar bone fragments embedded in the brain of the deceased.

"2. Gore, the removal of which had been attempted from the automobile jack of the family car of the accused and the deceased.

"3. Statements made on many occasions by the accused both drunk and sober that she wanted the deceased dead, that he had insurance, the proceeds of which would be paid to her and that she would pay $10,000.00 to 'see the son-of-a-bitch dead.'

"4. That shortly after the death of the deceased, the accused attempted suicide. The jury, who sat in the jury box for a week during this trial and passed upon the credibility of the witnesses who testified by observing them face to face, did not accept as true the story of the accused that she attempted suicide because her grand-daughter was going to be adopted by someone else.

"Certainly that jury must have viewed the suicide attempt at least as strongly as flight.

"Again quoting from Cawley:

" 'The following quotations from 22 C.J.S. Criminal Law § 812, pp. 1404 and 1405, cited by the State, appear to us to announce a correct rule and support the State's contention that the evidence is sufficient to corroborate the testimony of the accomplice witness: "Sufficient corroboration of the testimony of an accomplice to warrant a conviction may be furnished by the suspicious conduct of accused, such as flight after the crime was committed, . . . Proof that accused was at or near the scene of the crime at or about the time of its commission is admissible in corroboration of the testimony of the accomplice, and may tend to connect accused with the commission of the crime, so as to furnish sufficient corroboration to support a conviction when coupled with *suspicious circumstances*, such as . . . being in the company of the accomplice, . . . subsequent flight . . ." (Emphasis supplied).

" 'The case of Knox v. State, 106 Tex.Cr.R. 556, 293 S.W. 1111, appears to support our holding. See also Nichols v. State, 91 Tex.Cr.R. 277, 238 S.W. 232, 235, where we said that the evidence tending to show flight was relevant and that discrediting incidents developed in connection with proof of flight "appeared but res gestae of the flight and corroborative of the accomplice witness" '.

"It is our position that the corroborative circumstantial evidence in and of itself in this case would entitle the State to get to a jury on the question of guilt. By it, there is established a motive (the insurance money), prior malicious feelings for the deceased by the accused, and evidence of a homocide in the bedroom of the home where the accused lived with the deceased as his wife. There is suspicious conduct by the accused after the fact in that she attempted suicide and blood, which matched the type of the deceased, was found in her car.

"The case of Washburn v. State [167 Tex.Cr.R. 125], 318 2d 627, [318 S.W.2d 627], Tex.Crim.App.1958 is a case very similar to the case at bar. The weight of the circumstantial evidence is not as great as in this case and the Washburn case was affirmed by this Honorable Court.

"It appears that the proper test is whether there are circumstances from which a reasonable jury could infer that the ac-

cused is connected with the commission of the offense. Runkle v. State, [484] S.W.2d [912,] Cause #44,984, Tex.Crim.App., June 14, 1972. The circumstances regarding the prior relationship of the parties and the suspicious circumstances after the fact should far outweigh the mere fact that there is no testimony placing the accused at the scene of the crime at the immediate time of the offense.

"This Court has recently approved in Cherb v. State, 472 S.W.2d 273, Tex.Crim. App.1971, the following rule with regard to corroboration of accomplice testimony:

" 'This Court also said in Minor v. State, 108 Tex.Cr.R. 1, 299 S.W. 422, 1927, cited by the court in Edwards v. State, 427 S.W.2d 629, 632, Tex.Crim. App.1968: "The law forbidding a conviction upon the uncorroborated testimony of an accomplice does not demand that there be direct evidence pointing to the accused as the offender, but merely requires that there be 'other evidence tending to connect the defendant with the offense committed' . . . Circumstances proved by credible witnesses may be as potent as direct testimony intending to connect the accused with the commission of the offense. The State is not called upon to .point to some single or isolated fact which is itself, unrelated to other proven facts, will be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supply the test. If by this rule it appears on appeal that before the jury there was proof confirming the testimony of the accomplice to material facts tending to connect the accused with the commission of the offense, the law is satisfied." '

"Surely it appears on appeal that there was before the jury proof confirming the testimony of the accomplice, Linda Beryl Smith of facts tending to connect the accused with the offense, viewing its combined and cumulative weight. Under these circumstances, the State contends that its Motion for Rehearing should be granted, that the original opinion in this cause should be withdrawn, and that the judgment of the trial Court should be affirmed.

"This case should be affirmed in all respects in that the accomplice witness requirements are met and the jury found the defendant guilty beyond reasonable doubt and the accomplice witness to have been corroborated and there was sufficient evidence for such corroboration."

The evidence, including the testimony of Linda Smith, the only other living occupant of the trailer house, considered in the light most favorable to the verdict as we must do, excludes every other reasonable hypothesis except appellant's guilt.

For all the above reasons, the State's motion for rehearing should be granted and the conviction should be affirmed.